IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROLLS-ROYCE CORPORATION, | § | |
| | § | |
| Plaintiff- | § | |
| counterdefendant, | § | |
| | § | Civil Action No. 3:07-CV-0739-D |
| VS. | § | **SEALED OPINION** |
| | § | |
| HEROS, INC., et al., | § | |
| | § | |
| Defendants- | § | |
| counterplaintiffs. | § | |

MEMORANDUM OPINION
AND ORDER

In this *Daubert*[1] motion, the court is asked to exclude the opinions and testimony of Charles B. Dedmon ("Dedmon"), whom defendants intend to call as an expert witness at trial. Principally at issue are eight opinions that Dedmon intends to offer. For the reasons explained, the court grants the motion in part and denies it in part.

I

This is an action by plaintiff-counterdefendant Rolls-Royce Corp. ("Rolls-Royce") against defendants-counterplaintiffs HEROS, Inc. ("Heros"), Hye-Tech Manufacturing, LLC ("Hye-Tech"), and Heros Kajberouni ("Kajberouni")[2] asserting various claims related to the alleged misappropriation of Rolls-Royce's trade secrets.

---

[1] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-93 (1993).

[2] Kajberouni is the President and a substantial shareholder of Heros and a member and the Chief Executive Officer of Hye-Tech.

Defendants plead various counterclaims.[3]  This litigation arises in the context of the Parts Manufacturer Approval ("PMA") industry, which refers to a procedure by which the Federal Aviation Administration ("FAA") approves aftermarket parts for aircraft engine repair.

Rolls-Royce manufactures a Model 250 gas turbine engine that is used in light aircraft, helicopters, and unmanned aerial vehicles.  It estimates that 16,000 Model 250 engines are currently in use.  Rolls-Royce also makes parts for repairing the engines. It is classified by the FAA as an original equipment manufacturer ("OEM").  To protect its position in the repairs market, Rolls-Royce guards information about the design of the engine, its parts, and other products.

Through PMA, the FAA allows the manufacture and sale of aftermarket replacement parts for aircraft engines, including Rolls-Royce's Model 250.  Additionally, worn parts can be reworked and restored to serviceable condition under a process known as Designated Engineering Representative ("DER") repairs.[4]  Defendant Hye-Tech manufactures and sells PMA replacement parts for Rolls-

---

[3]The parties recently agreed to dismiss the claims and counterclaims for violations of the Racketeer Influenced and Corrupt Organizations Act.

[4]The opinions of Dedmon at issue in this motion do not pertain to DER repairs.

- 2 -

Royce Model 250 engines.[5]   Rolls-Royce alleges that defendants misappropriated its trade secrets——part drawings and technical data pertaining to the Model 250 engine——to obtain PMA from the FAA for aftermarket parts and approval for DER repairs.  Defendants counter that Hye-Tech is lawfully competing with Rolls-Royce in an accepted and highly-regulated PMA industry, that Rolls-Royce's pertinent design data were in the public domain, and that Rolls-Royce has disparaged and restricted PMA suppliers.  Heros is an FAA-certified repair station that overhauls and services Model 250 engines and component parts.

According to the record in this case, there are two avenues for gaining FAA approval.  The "identicality method" requires the manufacturer to show that its design for the part will produce a part identical to the OEM's.[6]  The process is cheaper and quicker

---

[5]Hye-Tech manufactures and sells 131 aftermarket PMA parts for Model 250 engines, directly competing with Rolls-Royce in aftermarket parts.  Heros repairs Model 250 engines.  Dedmon's testimony only concerns the PMA parts market.  Kajberouni is a principal figure in both companies.  Dedmon's testimony thus concerns only the conduct of Hye-Tech.  For this reason, the court treats Hye-Tech as the principal party to which this motion is directed.

[6]Hye-Tech maintains in its response that Rolls-Royce incorrectly describes the identicality method in its complaint. Rolls-Royce alleges that, "[t]o obtain PMA approval for the parts identified as the Group I Drawings, Hye-Tech had to establish that its part design was identical to the Rolls-Royce design, and it did that by direct comparison." Am. Compl. 11. Hye-Tech disputes this assertion, apparently arguing that the identicality method does not require it to possess an actual copy of the design of Rolls-Royce's part.  Rather, the comparison can be made as to design data reverse-engineered from the OEM's part.

than the "test and computation" method, which requires the PMA manufacturer to extensively test both the original and replacement parts to prove that they are equivalent.   But the test and computation method is useful where the aftermarket part is reverse-engineered from the original.   Rolls-Royce posits that Hye-Tech could not have reverse-engineered its Model 250 engine parts, and it must instead have based the parts on design information that it received from a third party who had once done business with Rolls-Royce.

Defendants intend to call Dedmon, an aviation consultant with work experience in the PMA market, to testify at trial regarding the PMA industry, contending that expert testimony regarding the industry will likely assist the trier of fact in resolving several factual disputes.   They maintain that Dedmon is highly experienced in the PMA industry, and that his opinions and testimony should be admitted because they will assist the jury in understanding the PMA industry, the practical application of FAA PMA regulations and procedures, FAA airworthiness certification processes for PMA parts, and potential sources of design data used by PMA manufacturers.   Rolls-Royce moves to exclude Dedmon's opinions and testimony.   It posits that some opinions are irrelevant, are not actually opinions (e.g., in some instances are legal conclusions), are unreliable, and intrude on the duties of the trier of fact and on the court's responsibility to instruct the trier of fact on the

law.

## II

The court decides Rolls-Royce's motion in its role as gatekeeper concerning the admissibility of expert testimony. *See, e.g., Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("Rule 702 charges trial courts to act as 'gate-keepers'"). To be admissible under Fed. R. Evid. 702, expert testimony must be both relevant and reliable. *See, e.g., id.* ("In short, expert testimony is admissible only if it is both relevant and reliable.").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-93 (1993)). An expert must also be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, ___ F.3d ___, 2009 WL 4022278, at *2 (5th Cir. Nov. 23, 2009) (quoting Rule 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

- 5 -

"Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 593).  To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 589).

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592.

### III

Rolls-Royce's supporting arguments are found in two places in its brief: in the background section (these arguments appear to be offered in opposition to Dedmon's testimony in its entirety), and in the argument section (these arguments pertain specifically to Dedmon's eight opinions and to other miscellaneous opinions found in his report).  Because Rolls-Royce does not repeat in the argument section the following grounds for excluding Dedmon's opinions and testimony, the court will address them before turning to Rolls-Royce's challenges tied to specific opinions.

### A

In the background section, Rolls-Royce contends that Dedmon employed a flawed methodology for preparing his report, resulting in opinions that are so vague and generic that they do not mention Rolls-Royce, its design data, the Model 250 engine, or its

component parts.  Rolls-Royce complains that Dedmon did not examine Rolls-Royce part drawings or specifications or Hye-Tech part drawings or specifications related to the Model 250 engine; he did not review data packages for Model 250 engine aftermarket parts that Hye-Tech submitted to the FAA for PMA review; he does not know how Hye-Tech obtains designs for PMA parts; and the extent of his work was to conduct a random search on the FAA website to see what PMA approvals Hye-Tech had obtained.  Rolls-Royce argues that Dedmon's opinions do not fit the facts of this case and would not be helpful to the jury in determining a fact in issue.  Expert testimony must relate to a factual or legal issue in dispute and help the jury resolve the issue.  *TC Sys. Inc. v. Town of Colonie,* 213 F.Supp.2d 171, 175 (N.D.N.Y. 2002).  Rolls-Royce argues that Dedmon's report cannot meet this requirement because it deals only with the practices of the replacement parts market and does not address the Model 250 engine or the process used by Hye-Tech for developing Model 250 engine parts.

Defendants respond that Dedmon's testimony should be admitted because it will assist the jury in understanding the PMA industry, the practical applications of the FAA's regulations and procedures, and potential sources of design data.  They contend that the testimony is necessary to refute Rolls-Royce's repeated mischaracterizations of the PMA process.

Dedmon's testimony is admissible if it is reliable and

relevant.  *See Pipitone*, 288 F.3d at 244.  The testimony does not concern the Model 250 engine specifically.  Rather, defendants offer his testimony to educate the jury about the PMA process. Specific research into the Model 250 engine or Hye-Tech's process for securing PMA status is not required to provide the background information that Dedmon intends to offer.  Dedmon has 40 years of experience in the PMA parts business, including responsibility for product development and FAA compliance for an aftermarket parts maker.  Despite Dedmon's lack of research into the Model 250 engine specifically, his opinions are reliable for the limited purposes for which they are offered.

Without knowledge of the parts in question, the design and approval process, or the Model 250 engine, Dedmon cannot offer testimony about how Hye-Tech developed Model 250 engine parts—an ultimate issue in the case.  But an expert need not offer an opinion on the ultimate issue.  *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (allowing psychologist to testify about possible cause for drop in plaintiff's IQ, despite fact that psychologist would not opine that incident at issue was the cause). Dedmon's testimony is useful to teach the jury background information necessary to understand the case, and is therefore relevant to the extent of providing the jury pertinent information about the PMA process in general.  *See* Fed. R. Evid. 702 advisory committee's note.

B

Rolls-Royce also contends that Dedmon is unqualified to testify because he lacks experience with the PMA approval process and federal regulations associated with PMA parts involving gas turbine engines like the Model 250; his conclusions are based on personal experience and personal opinion regarding PMA approval for piston, not gas turbine, engine parts; and apart from what is reported in the news, seminars, and in litigation filings, he is unfamiliar with the gas turbine engine industry. As noted, Dedmon has no experience with the Model 250 engine, has never worked on projects involving parts for that engine, has never seen a Rolls-Royce part drawing for the Model 250 engine, and has never seen a data package submitted by a manufacturer for approval of PMA parts for the Model 250 engine.

"Whether an individual is qualified to testify as an expert is a question of law . . . . Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citations omitted).

The court notes initially that, regarding Dedmon's industry experience, Rolls-Royce appears to be incorrect factually. While Dedmon testified that his primary experience is with piston

engines, he also stated he has obtained design information and PMA status for a particular turbine engine.   P. App. 8.   More important, Rolls-Royce offers nothing more than a bare assertion that piston engines are so different from turbine engines that experience with one is useless in analyzing the other.   Obviously, the two engines make use of different physical processes.   But Rolls-Royce does not explain how——given the nature of and purposes for Dedmon's proposed testimony——the process of designing piston engine replacement parts is materially different from designing turbine engine replacements parts.   Similarly, Rolls-Royce does not explain how, if at all, seeking FAA approval for piston engine replacement parts materially differs from the approval process for turbine engine replacement parts.

Dedmon has 40 years of experience in the PMA parts business. He has been responsible for product development and FAA compliance for an aftermarket parts maker.   And he was president of another company that designed and sold replacement parts.   For the last ten years, he has served as a consultant on the engineering, certification, and manufacturing of replacement parts.   The court accordingly holds as a matter of law that Dedmon is qualified to offer expert testimony.[7]

---

[7]Of course, the court may sustain a trial objection to a proffered opinion that Dedmon is not qualified to give.

C

Rolls-Royce challenges Dedmon's testimony on the ground that he has never before testified as an expert witness and that this is the first matter in which he has been retained as an expert. It posits that significant aspects of his report were taken from a speech and PowerPoint presentation given in 2000 and never updated; he did nothing in preparing the report to correlate the speech and PowerPoint to what Rolls-Royce was or is doing; and other sections of his report were taken directly from the FAA website or from news articles found on other websites.

Dedmon's lack of experience as an expert witness is no bar to his testimony. An expert witness must be an expert in a given field, not an experienced witness. Although a proposed expert's lack of experience testifying can in some instances indicate that he lacks the qualifications to do so—e.g., he has never before been asked to serve as a trial expert because he is perceived as not qualified—the record does not support that finding regarding Dedmon.

Rolls-Royce's argument that significant parts of his opinions were taken from a 2000 speech is denied without prejudice as moot. Dedmon testified that he gleaned information for the section of his report entitled "Competition and Economic Considerations of PMA Parts." As explained below, the court excludes this section for other reasons. *See infra* § XII. Similarly, Rolls-Royce also

- 11 -

argues that Dedmon copied several news articles into his report. This copying appears in the section entitled "Safety Record of FAA-PMA Parts."  As explained below, this section is also excluded for other reasons.  *See id.*

Dedmon also testified that some of his information came from the FAA's website.  Parts of the first section, on the history of the aviation industry, were copied verbatim.  But the contents of the section are uncontroverted and uncontroversial.  Fed. R. Evid. 703 provides that an expert can rely on inadmissible evidence in forming his conclusions, provided the evidence is of a type reasonably relied on by others in the field.  Information prepared and disseminated by the regulatory body in the field appears to meet this threshold.  His use of the FAA website therefore does not render this section of his report unreliable.  Dedmon also cannot be faulted for copying pertinent federal regulations into his second section, which describes the PMA process.  FAA regulations are also reasonably relied on by those in Dedmon's field.  His accurate reproduction of relevant regulations does not render his opinion unreliable.  His report is not excludable merely because he took some of its contents from the FAA.

IV

The court now turns to Rolls-Royce's specific objections.

A

Defendants intend to offer the following as Dedmon's first opinion:

> In part because of the Federal Aviation Regulations and their interpretation and application by the Federal Aviation Administration, the United States has the largest and safest civil aviation industry in the world.

Ds. App. 13.

Rolls-Royce maintains that Dedmon concedes that this is more an introductory statement than an expert opinion, that the safety of the American civil aviation industry is not a disputed issue in this case, and that the opinion is therefore irrelevant and would not be helpful to the jury.

Defendants respond that Rolls-Royce, by alleging that Hye-Tech's parts are unsafe and obsolete, has questioned the FAA's PMA approval procedures, including its approval of Hye-Tech's Model 250 engine parts.  It reasons that the first opinion is relevant to whether Hye-Tech's parts are actually unsafe.

B

Rule 702 does not require that an expert's testimony relate specifically to the facts at issue in a case. *See Strauss Farms, Inc. v. Combs Commodities, Inc.,* 2005 WL 946523, at *3 (D. Kan. Mar. 29, 2005) (allowing testimony about nature of spontaneous

- 13 -

combustion of cottonseed without applying theory to fire at issue in case).

> [I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702 advisory committee's note.  When an expert testifies to educate the factfinder on general principles, "Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." *Id.*  The second and fourth requirements merely state that an expert's testimony must be relevant. *See Miller v. Holzmann*, 563 F.Supp.2d 54, 91-92 (D.D.C. 2008) (citing *Daubert*, 509 U.S. at 591).  If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, he can be admitted as a "teaching witness." *See id.* at 94.[8]

---

[8]In *Miller* the court allowed the testimony of an economist who contrasted the way a procurement auction would work under competitive conditions with the way it would work under collusive conditions, but never addressed which conclusions the facts of the

Testimony is irrelevant, however, when an expert offers a conclusion based on assumptions unsupported by the facts of the case. *See Elclock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000) (holding that economist's damages model used to show plaintiff's damages was inadmissible because it relied on assumptions that were contradicted by facts in the record). An opinion is unhelpful to a trier of fact if it attempts to apply a general observation about a larger group to particular individuals whose conduct is in question. *See Rowe Entm't., Inc. v. William Morris Agency, Inc.*, 2003 WL 22272587, at *7 (S.D.N.Y. Oct. 2, 2003) (finding that opinion about discrimination in concert promotion industry was not relevant to issues in plaintiffs' case because case concerned conduct of booking agencies and promoters toward other promoters, not the industry at large, and the evidence would only inject unfair prejudice).

Dedmon's first opinion states that because of the FAA regulation, America has the largest and safest civil aviation industry in the world. The safety of the industry is not at issue,

---

case supported. *Miller*, 563 F.Supp.2d at 94. Similarly, the court in *Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc.*, 2006 WL 1329999 (N.D. Cal. May 15, 2006), allowed expert testimony about the history of medical treatments involving cardiopulmonary bypass and dialysis and related technology, but did not address the patents disputed in the suit. *Id.* at *4. The court reasoned that because the subject matter of the patents was beyond the understanding of the average layperson, a basic tutorial on the area of medicine would assist the factfinder in making its determinations. *Id.* at *5.

and an understanding of this fact, generalized and unsupported as it is, would not assist the trier of fact in resolving a fact issue in this case.[9]  Accordingly, the court grants Rolls-Royce's motion to exclude Dedmon's first opinion.

V

A

Dedmon's second opinion is this:

> The FAA has enacted and implemented regulations, particularly Federal Aviation Regulation 21.303, which provides for certification and manufacture of PMA replacement parts for products approved under FAA Type Certificates that meet substantially the same airworthiness requirements as the Type Certificate holder.  Issuance of a PMA to a company indicates that FAA has made a positive finding that the applicant can produce a replacement part equal in airworthiness to that of an OEM.

Ds. App. 13.

Rolls-Royce contends that Dedmon acknowledges that he is merely summarizing his interpretation of Federal Aviation Regulation 21.303 and that all he did to reach this conclusion was to read the regulation and then summarize or restate what he believes to be the law.  Rolls-Royce challenges Dedmon's qualification to render this opinion and contests the admissibility

---

[9]By comparison, the first section of Dedmon's report, entitled "History and Background," provides a basic primer on how current regulations developed.  Although it does not address a disputed fact issue, it would assist the trier of fact in understanding other facts at issue in the case.  Such testimony about the history of industry regulation can be presented at trial.

of his legal opinions.  It maintains that the second opinion is not helpful to the jury, invades the role of the court, and is inadmissible under Rule 702.

Defendants respond that this testimony will assist the jury in understanding the findings the FAA must make before it grants PMA; the practical significance and importance of those findings, such as the necessity for a finding that the PMA part is airworthy under Federal Aviation Regulations ("FARs"); and how the approval process occurs.  Defendants point to Rolls-Royce's allegations that it has legitimate safety interests with respect to Model 250 engine PMA parts and that Hye-Tech is using outdated or obsolete information as a basis for PMA part design.  Defendants argue that they must counter Rolls-Royce's allegations that Hye-Tech's PMA parts are unsafe and will jeopardize public safety if used.  They assert that Dedmon's testimony will assist the jury in understanding the significance of FAA PMA of Hye-Tech parts: that because Hye-Tech must meet the airworthiness standards of the FARs, its parts are just as safe as the OEM parts of Rolls-Royce.

B

An expert cannot offer conclusions of law.  *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).[10]  Dedmon's second

---

[10]In *Snap-Drape* the proffered experts intended to offer to the tax court a conclusion about the proper treatment of certain dividends.  *Snap-Drape*, 98 F.3d at 197.  The court determined that the experts' testimony would consist of nothing more than legal arguments.  *Id*. at 198.

opinion basically states that the FAA regulates the design and sale of replacement parts, so that FAA approval indicates that a part is airworthy.  He does not give the meaning of a law or offer a legal conclusion.  Dedmon describes a complex regulatory process from the perspective of a manufacturer.  He observes that for the FAA to grant PMA, it must first find the part to be airworthy.  The explanation does not invade the role of the court.  And the testimony is helpful for the jury to understand the import of FAA approval.  The court accordingly denies Rolls-Royce's motion to exclude with regard to the second opinion.

VI

A

The third opinion is a more focused version of the second.  It states that Hye-Tech received PMA approval for its parts, so the parts must be airworthy.

> HEROS, Inc., Hye-Tech Manufacturing, LLC, and
> Heros Kajberouni (collectively "HEROS") have
> obtained PMA for a number of replacement parts
> for type certificated products.  Therefore,
> the FAA has made a positive finding that HEROS
> meets the airworthiness requirements of the
> FARs and has demonstrated the ability to
> produce replacement parts that are equal in
> airworthiness to an OEM.

Ds. App. 13.

Rolls-Royce contends that the first sentence is a statement of fact that is not beyond the common understanding of the jury and is therefore unhelpful.  It posits that the second sentence is

- 18 -

deficient on the same bases as is Dedmon's second opinion: it is a legal conclusion masquerading as an expert opinion, and Dedmon admitted that his opinion regarding airworthiness was based on his reading and interpretation of federal regulations. Therefore, Rolls-Royce maintains that the third opinion is not helpful to the jury, invades the province of the court, and is inadmissible under Rule 702.

Defendants offer the same response in support of Dedmon's third opinion as they do regarding his second opinion.

B

The third opinion is merely a more focused reprise of the second. And it is permissible for the same reasons as is the second. The first sentence, a statement of fact, is not offered simply to inform the jury that Hye-Tech has PMA for Model 250 engine parts. It is instead offered as a premise for the conclusion that the parts are airworthy; without that premise, the conclusion is incoherent. Because the first sentence is necessary to arrive at the conclusion of the opinion, it is admissible, even though a non-expert witness could testify to the fact. The second sentence is admissible for the same reasons as is the second opinion. Rolls-Royce's motion to exclude the third opinion is denied.

- 19 -

VII

A

In his fourth opinion, Dedmon states that information for developing design data for a PMA application is available in the public domain.

> The information for developing design data for PMA application is available in the public domain. Sources for this public information include, but are not limited to, data for products developed at U.S. government expense, data developed by actual manufacturing sources that have assisted OEMs in developing products, data published in maintenance manuals and service documents.

Rolls-Royce contends that the first sentence of this opinion contains a broad and sweeping conclusion based solely on Dedmon's personal experience and personal opinion concerning PMA approval for piston engine parts, not gas turbine engine parts, and is therefore irrelevant; that Dedmon did not perform any analysis to correlate this opinion to the gas turbine aircraft engine industry or to Rolls-Royce and the Model 250 engine in particular; that Dedmon has no empirical evidence or data that correlate this opinion to Rolls-Royce or the Model 250 engine; and that Dedmon has no empirical evidence or data that any information contained in the Hye-Tech data packages submitted to the FAA is from the public domain. Rolls-Royce therefore contends that the opinion is fundamentally unsupported, is not connected to the disputed facts and issues regarding Hye-Tech, Rolls-Royce, or PMA parts for the

- 20 -

Model 250 engine, and offers no assistance to the jury.

Defendants respond that the reliability of the opinion is supported by Dedmon's experience in the PMA industry, so that no analysis of the gas turbine industry is required. They maintain that the opinion is not offered to explain the source of Hye-Tech's design data or to assert that Model 250 engine data are in the public domain. They indicate that they intend to argue separately that Model 250 engine design data are in the public domain, and intend Dedmon's testimony to educate the jury that such availability is not unusual.

B

Rolls-Royce has not explained the significance of the difference between the piston engine and the turbine engine as it relates to the PMA process. Dedmon has extensive experience in the PMA industry, and the opinion at issue is reliable and supported, even absent direct research into this specific engine. Because the opinion is not based on research into the Model 250 engine or Hye-Tech's approval process, Hye-Tech cannot attempt to use the testimony to persuade the trier of fact that Model 250 engine information was in the public domain. But an understanding of the design data gathering process would be useful to help the trier of fact understand separate testimony about the role of public information in the PMA process. While the opinion cannot be offered to support the premise that Hye-Tech obtained design data

legally, it can be offered to explain information gathering in the PMA industry.  Rolls-Royce's motion to exclude the fourth opinion is therefore denied.

VIII

A

Dedmon's fifth opinion is this:

> Other companies have obtained PMA for replacement parts for Rolls-Royce engines by the process of identicality, further indicating the availability of the design data for the public domain.  These companies include, but are not limited to, Pacific Sky Supply, and Arnoni Aviation Services, Inc.

Ds. App. 13.

Rolls-Royce contends that this opinion lacks a connection to the pertinent inquiries in this case.  It posits that despite Dedmon's assertion that companies like Pacific Sky Supply and Arnoni Aviation Services, Inc. have obtained PMA, Dedmon does not know whether the parts are the same as the ones at issue in this case, or whether these companies used the same OEM data that Hye-Tech used in obtaining PMA.  And it points to Dedmon's acknowledgment that an identicality designation by the FAA does not indicate whether the OEM data used to obtain PMA were stolen or misappropriated.  Rolls-Royce therefore maintains that Dedmon's fifth opinion is fundamentally unsupported, is irrelevant, will not help the jury, and is inadmissible under Rule 702.

Defendants respond that Dedmon has a legitimate factual basis

for the opinion: FAA records he reviewed.  They argue that the opinion counters Rolls-Royce's assertion that it protects its design data; that the availability of other design data creates a reasonable probability that Model 250 engine design data are also available; that Dedmon's testimony will assist the jury in understanding how a PMA manufacturer applies for and obtains FAA approval, including the specific types of information that must be submitted; and that his testimony will assist the jury in understanding potential sources of design data used by PMA manufacturers to prepare PMA applications.

B

The court concludes that the fifth opinion must be excluded as unreliable.

Restated, Dedmon's opinion is this: because other companies (two in particular) have obtained PMA for replacement parts for Rolls-Royce engines by the process of identicality, it is apparent that design data for Rolls-Royce engine parts are available in the public domain.  This opinion is similar to Dedmon's fourth opinion. But unlike that opinion——which relates more broadly to public-domain sources of information for developing design data for PMA applications and can be viewed as a teaching opinion——Dedmon purports in his fifth opinion to say specifically that design data for Rolls-Royce engine parts are available in the public domain. As such, it goes beyond teaching.  The basis for this opinion is

circumstantial evidence that other companies have obtained PMA for replacement parts for Rolls-Royce engines by the process of identicality.

The court determines the reliability of an expert opinion by assessing the validity of the expert's reasoning or methodology. *See Knight*, 482 F.3d at 352. Dedmon's reasoning or methodology amounts to nothing more than reliance on circumstantial evidence. And if an expert in stating an opinion is going to do what is essentially nothing more than what a lay jury normally does (i.e., evaluate circumstantial evidence), he must have a reliable basis for stating an *expert* opinion. Dedmon's fifth opinion is unreliable because it assumes that if other companies received PMA for replacement parts for Rolls-Royce engines by the process of identicality, they necessarily (or at least probably) obtained the design data from the public domain. This assumption fails to take into account the possibilities that these companies obtained design data by such methods as illegally procuring Rolls-Royce's original plans or by reverse engineering. Defendants maintain that Dedmon's information source was FAA records, but they have failed to establish that these records would of themselves reflect an applicant's *source* of information for design data.

Accordingly, although the court will otherwise permit Dedmon to teach the jury about the PMA industry and perhaps express related opinions, as outlined today, the court excludes his fifth

opinion.

IX

A

The sixth opinion states:

> The finding of identicality by the FAA does
> not mean the data is photographically
> identical to type certificated data but that
> the product will be identical in form, fit and
> function.

Ds. App. 13.

Rolls-Royce argues that, like Dedmon's second and third
opinions, his sixth opinion is merely a legal conclusion expressed
in the form of an expert opinion and simply summarizes his
interpretation of the language in the regulations, orders, and
policies regarding the meaning of identicality.  Rolls-Royce
maintains that the opinion should be excluded under Rule 702 as
unhelpful and as invading the role of the court.  It also argues
that the opinion is unsupported because it misstates the FAA orders
that control the process.

Defendants respond that Dedmon's testimony will assist the
trier of fact in understanding how various terms of art are used in
the PMA industry, including the terms "identicality" and "test and
computation."  They posit that these terms are disputed and that
Rolls-Royce uses them incorrectly in its amended complaint.
Defendants say that Dedmon's testimony will assist the jury in
understanding Hye-Tech's contention that "identicality" does not

- 25 -

mean that the design data used by the PMA applicant's part drawing must be a photographic copy, but instead must only be identical in form, fit, and function to the design data of the OEM part. Further, Dedmon's testimony will explain what information is necessary to obtain PMA.

B

Dedmon opines that identicality-based approval does not mean the FAA compared a replacement maker's design data to an OEM's type certificated data (i.e., the original plans); rather, the FAA can find identicality if the proposed part will be identical in form, fit, and function to the original.[11]

This proposed testimony contains no impermissible legal conclusions. Based on his industry experience, Dedmon describes a complex design and approval process, explaining what a manufacture can do to get PMA for replacement parts. He does not opine about the meaning of a law or offer a legal conclusion. The opinion does not lack foundation simply because Rolls-Royce alleges that it is inaccurate. If it is inaccurate, Rolls-Royce can counter it by offering competing testimony on the subject at trial. The court thus denies Rolls-Royce's motion to exclude with regard to Dedmon's sixth opinion.

---

[11]Similarly, in the main body of his report, Dedmon describes the process for obtaining approval to manufacture replacement parts, and in so doing summarizes a number of regulatory requirements for the process.

X

A

In his seventh opinion, Dedmon states:

> The design data for a part can readily be
> determined by reverse engineering. This
> reverse engineering, coupled with a knowledge
> of industry standard techniques and processes
> (which are contained in published SAE and AMS
> specifications) can allow the development of
> design data for a submission for FAA approval
> based on either identicality or test and
> computation.

Ds. App. 13.

Rolls-Royce moves to exclude this opinion on the grounds that it is fundamentally unsupported, does not fit the facts and issues pertinent in this case, and is not helpful to the jury. It specifically argues that Dedmon's conclusion that the design data for a part can readily be determined by reverse engineering does not correlate to Hye-Tech, Rolls-Royce, or the Model 250 engine; Dedmon does not know whether Hye-Tech uses reverse engineering; and he admitted that he is unaware whether the data Hye-Tech submitted to the FAA for PMA of the Model 250 engine aftermarket replacement parts were readily ascertainable by reverse engineering.

Defendants respond that the opinion is supported by Dedmon's experience in the PMA industry. They submit that the opinion is not offered to explain Hye-Tech's design and approval process for Model 250 engine parts. They argue that the opinion is relevant to whether design data can be obtained from reverse engineering. The

- 27 -

opinion also supports their argument that a manufacturer can gain PMA via the identicality method without the original manufacturer's design data.

B

Dedmon states that design data necessary for the identicality method can be obtained by reverse engineering.[12]  The opinion is supported by Dedmon's extensive experience.  Rolls-Royce correctly points out that this evidence does not go to the central dispute in the case: how Hye-Tech came by its design data for Model 250 engine parts.  Rolls-Royce complains that the opinion is not supported by any analysis of Rolls-Royce, the Model 250, or gas turbine engines. But an expert need not offer an opinion on the ultimate issue. *Walker*, 208 F.3d at 587.  The factfinder would be assisted by a generalized explanation of the available methods of developing and gaining approval for PMA parts.  Moreover, Rolls-Royce alleges that Model 250 engine parts cannot be reverse-engineered, even with the help of old design data.  It also describes the identicality method to preclude the use of reverse engineering.  Testimony of the design and approval process is probative of this element of proof for Rolls-Royce's claim.  Rolls-Royce can offer competing testimony that unique characteristics of the Model 250 engine preclude

---

[12]Similarly, the section entitled "How PMA Applicants Develop Design Data" explains ways manufacturers can go about getting information for their applications (including from information in the public domain).

- 28 -

reverse engineering, presenting a challenge to the weight to be given to Dedmon's testimony.  Rolls-Royce's motion to exclude the seventh opinion is accordingly denied.

XI

A

Dedmon states the following as his eighth opinion:

> Documents and data that can be utilized to develop design data are readily available through the Freedom of Information Act or directly from military procurement offices, indicating that the U.S. government represents that this information is in the public domain.

Ds. App. 13.

Rolls-Royce objects to the first portion of this opinion, positing that Dedmon cannot speak to all documents and design data. It also argues that Dedmon admitted that he does not know whether Rolls-Royce design data are available through the Freedom of Information Act ("FOIA"), he has never tried to obtain Rolls-Royce design data through a FOIA request or military procurement offices, he has no empirical evidence or data to support this opinion as it relates to Rolls-Royce or the Model 250 engine, and he does not know how Hye-Tech obtained Rolls-Royce technical information or whether the information was in the public domain.  Rolls-Royce argues that Dedmon essentially retracted his eighth opinion during his deposition when he testified that he was not rendering an opinion that any Rolls-Royce data used by Hye-Tech in obtaining PMA were in the public domain by virtue of FOIA.  Rolls-Royce therefore

contends that Dedmon's opinion is fundamentally unsupported, does not fit the disputed issues, will not help the jury, and is inadmissible under Rule 702.   Defendants respond that Dedmon's opinion would help the jury understand that FOIA requests are a common way to obtain design data in the PMA industry.   It states that while it will offer evidence that it obtained Model 250 engine design information via FOIA requests, it will not offer Dedmon's opinion to prove this point.

B

The first part of this opinion is similar to Dedmon's fourth opinion, in that he offers the factual observation that design data can be obtained through FOIA requests.   Despite the fact that he cannot speak to all documents or Model 250 engine data in particular, Dedmon's opinion explains background information that would be helpful to the jury.   And although he did not research particular design data, the evidence is supported by Dedmon's personal experience in the PMA industry.   But in the second portion, he opines that because design data can be obtained from the United States through FOIA requests, the United States represents it to be in the public domain.   This amounts to a conclusion about the legal significance of the government's conduct.   This conclusion is not helpful to provide background information to the trier of fact.   With respect to Dedmon's eighth opinion, Rolls-Royce's motion to exclude is granted in part and

denied in part.[13]

XII

Rolls-Royce also challenges several parts of Dedmon's report that contain statements and conclusions that may or may not be encompassed within the eight opinions addressed above.

These statements are irrelevant because their only probative value is to suggest facts about Rolls-Royce and Hye-Tech based on general observations about other companies in the parties' respective industries.   The section entitled "Competition and Economic Considerations of PMA Parts"[14] describes the development of the PMA parts industry and OEMs' competitive reaction to PMA manufacturers (essentially stating that they use unfair tactics to limit competition).[15]   The last section of the body of the report is entitled "Safety Record of FAA-PMA Parts," which describes just that.   Rolls-Royce argues these sections are irrelevant because they were composed without any regard for the Model 250 engine. Other than the general argument that Dedmon's testimony is useful

---

[13]For clarity, only the portion after the comma is excluded.

[14]This section encompasses the subsections "Economic Structure of the Market" and "OEM Competitive Reaction to PMA Suppliers."

[15]Defendants argue that a description of OEM competitive reaction to PMA parts is necessary to counter Rolls-Royce's persistent description of its Model 250 engine parts as "imitation parts."   Whatever probative value this section might have is substantially outweighed by the risk of prejudice by conflating Rolls-Royce's conduct with that of the industry as a whole. *See* Fed. R. Evid. 403.

to provide background information to the trier of fact, defendants offer no specific defense of these sections.

The statements relate to counterclaims filed by defendants for violations of the Sherman Act, 15 U.S.C. § 1, and Lanham Act, 15 U.S.C. § 1125(a), among others.  These claims involve allegations that Rolls-Royce used unfair methods of competition and made unfounded claims that Hye-Tech's parts were unsafe.  But the statements and opinions purport to describe the conduct of companies in the PMA and OEM industries, not Hye-Tech and Rolls-Royce.  That the PMA industry has a record of safety does not indicate that Hye-Tech's products are safe.  And that other OEMs use unfair tactics does not mean that Rolls-Royce used them against Hye-Tech.  The statements have no value for teaching the trier of fact; rather, they are used to establish guilt (or safety) by association.  Accordingly, the opinions in that section are excluded.

*     *     *

Accordingly, for the reasons explained, the court grants in part and denies in part Rolls-Royce's October 22, 2009 motion to exclude the opinions and testimony of Dedmon.

**SO ORDERED.**

January 14, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

- 32 -