IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROLLS-ROYCE CORPORATION,           §
                                   §
          Plaintiff-               §
          counterdefendant,        §
                                   §  Civil Action No. 3:07-CV-0739-D
VS.                                §
                                   §   **SEALED OPINION**
HEROS, INC., et al.,               §
                                   §
          Defendants-              §
          counterplaintiffs.       §

MEMORANDUM OPINION
AND ORDER

In this litigation alleging claims and counterclaims related to the repairing and servicing of a turbine engine used in light aircraft, helicopters, and unmanned aerial vehicles, the parties present cross-motions for summary judgment, related motions concerning expert testimony and summary judgment evidence, and a motion for leave to designate responsible third parties. For the reasons that follow, the court grants in part and denies in part the cross-motions for summary judgment and decides the other motions as set forth below.

I

This is a suit by plaintiff-counterdefendant Rolls-Royce Corp. ("Rolls-Royce") alleging that defendants-counterplaintiffs H.E.R.O.S., Inc. ("Heros"), Hye-Tech Manufacturing, LLC ("Hye-Tech"), and Heros Kajberouni ("Kajberouni")[1] misrepresented Rolls-

_____

[1]Kajberouni is the President and a substantial shareholder of Heros and a member and the Chief Executive Officer of Hye-Tech.

Royce products as their own——a practice known as "reverse palming off"[2]——and misappropriated Rolls-Royce's trade secrets. Defendants assert various counterclaims.

Rolls-Royce manufactures Model 250 turbine engines used in light aircraft, helicopters, and unmanned aerial vehicles. The Model 250 is the civilian variant of the T-63 engine originally developed and manufactured in the 1950s for the United States Army by General Motors' Allison Gas Turbine Division. The division became the newly formed Allison Engine Co., Inc. in 1993 and was then purchased by Rolls-Royce in 1995.[3]

Rolls-Royce[4] is classified by the Federal Aviation Administration ("FAA") as an original equipment manufacturer ("OEM") of Model 250 engines. Rolls-Royce also manufacturers directly or through vendors the aftermarket replacement parts needed for the engines and now sells these parts exclusively through its distributor, Aviall, Inc. ("Aviall"), located in Texas. Rolls-Royce operates one Rolls-Royce Service Center and further participates in the repair of Model 250 engines indirectly by

---

[2]By contrast, "palming off" refers to when a seller attempts to pass off his own goods as those of another. *See Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.*, 457 F.3d 1269, 1277 n.3 (5th Cir. 2006).

[3]The court will refer to the Allison Gas Turbine Division, Allison Engine Co., Inc., and Rolls-Royce collectively as "Rolls-Royce" unless the context otherwise requires.

[4]Rolls-Royce is a Delaware corporation whose principal place of business is in Indianapolis, Indiana.

licensing Authorized Maintenance Centers ("AMCs").[5]  These AMCs are independent repair shops that pay a participation fee for proprietary technical information and instruction from Rolls-Royce. Many service other types of engines.

Hye-Tech manufactures and sells 131 aftermarket replacement parts for Model 250 engines, directly competing with Rolls-Royce in the market for replacement parts.  The FAA has granted Hye-Tech "Part Manufacturer Approval" ("PMA") to manufacture these parts. PMA refers to the procedure by which the FAA approves fabrication of aftermarket parts by an entity other than the OEM, but does not indicate that the FAA has found that Hye-Tech has the legal rights to any design information used in its PMA application.  PMA can be granted by demonstrating that the proposed design is identical in form, fit, and function to the OEM's part, or that the proposed design meets airworthiness standards through "tests and computations."  The first method, "identicality," is the easiest path to PMA.  Hye-Tech obtained its first PMA in 2000 and obtained approvals using both "test and computation" and "identicality." Ds. App. 620.  The FAA maintains a publicly-available database of the PMAs it has granted.

Heros has repaired Model 250 engines since its formation in

[5]AMCs are the successors of a network of service centers dating back to the 1960s.  In 1986, Allison Gas Turbine Division renamed the service centers in the network "Authorized Maintenance Overhaul Centers" ("AMOCs").  The AMOCs were subsequently replaced by the AMCs in approximately 1995.

1988.  In these repairs, a Designated Engineering Representative ("DER") inspects repaired parts to ensure that the parts meet airworthiness standards.  To obtain the right to perform "DER repairs," a company must obtain FAA approval of the step-by-step technical process for the repair.  Heros has FAA approval to perform at least 34 DER repair procedures for the Model 250, dating from its first DER repair authorization in 1992.

This case involves two types of technical documents issued by Rolls-Royce: part drawings and Overhaul Information Letters ("OILs").[6]  OILs provide detailed processes, procedures, techniques, and material specifications helpful in repairing Model 250 engines.  The part drawings contain detailed design information for Model 250 parts, including dimensions, tolerances, material specifications and requirements, and manufacturing processes and techniques.  The part drawings could be useful in obtaining PMA while the OILs could be useful in obtaining approval for DER repairs.

Rolls-Royce sues Heros, Hye-Tech, and Kajberouni, asserting

---

[6]These are also referred to as Distributor Overhaul Information Letters ("DOILs") and Approved Maintenance Center Overhaul Information Letters ("AMC-OILs").  The difference between the two relates to a change in the Model 250 distribution network.  In 2004 Rolls-Royce canceled all OILs and reissued them as "Parts Repair Procedure Letters" ("PRPLs").  The court will refer to all three types of documents generically as OILs unless the context otherwise requires.

seven grounds for relief,[7] and now moves for summary judgment on two of its claims. Rolls-Royce alleges that defendants engaged in reverse palming off, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), by purchasing genuine Rolls-Royce Model 250 parts, repackaging them, and selling them under Hye-Tech's name and FAA parts number. Rolls-Royce asserts that defendants misappropriated its trade secrets (various OILs and part drawings) regarding the Model 250 engine. Rolls-Royce moves for partial summary judgment on both of these claims; defendants move for summary judgment on the misappropriation of trade secrets claim.

Defendants assert various counterclaims. They allege, *inter alia*, that Rolls-Royce uses unlawful tying arrangements to induce customers to use Rolls-Royce replacement parts or repair services for the Model 250 engine, in violation of 15 U.S.C. § 1; that Rolls-Royce has abused its monopoly of Model 250 engines to drive defendants from the aftermarket parts and repair markets, in violation of 15 U.S.C. §§ 1-2; and that Rolls-Royce has violated the Texas Free Enterprise Act and Antitrust Act, Tex. Bus. & Comm. Code Ann. § 15.05(a), (c)-(d) (Vernon 2002), by claiming nonexistent proprietary rights, engaging in predatory pricing and

---

[7]Rolls-Royce initially alleged ten claims against defendants, but the parties have stipulated to the dismissal of their claims and counterclaims for violations of federal and state racketeering laws (i.e., counts IV, V, and VIII of Rolls-Royce's amended complaint, and counts I and II of defendants' second amended original answer and counterclaims).

unlawful tying arrangements, and generally engaging in anticompetitive conduct. Defendants also seek a declaratory judgment that Rolls-Royce does not have any proprietary interest in the drawings and technical information at issue in this case. Rolls-Royce moves for summary judgment dismissing these counterclaims.

In addition to their summary judgment motions, the parties have also filed the following motions that the court addresses in this memorandum opinion and order: (1) Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Jerry R. Reno ("Reno"); (2) Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Michael Molish, II ("Molish"); (3) Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Christopher C. Pflaum, Ph.D. ("Dr. Pflaum"); (4) defendants' December 18, 2009 motion for leave to designate responsible third parties; (5) defendants' January 22, 2010 motion to strike Rolls-Royce's new, unpleaded claims and summary judgment evidence; (6) defendants' February 10, 2010 motion for leave to file appendix; and (7) Rolls-Royce's February 17, 2010 motion to delete certain part drawings.

II

A

The parties' summary judgment burdens depend on whether they are addressing a claim or counterclaim for which they will have the

burden of proof at trial.

Rolls-Royce moves for summary judgment on claims for which it will bear the burden of proof at trial (i.e., reverse palming off and trade secret misappropriation). Defendants move for summary judgment based on an affirmative defense (limitations as a bar to Rolls-Royce's trade secret misappropriation claim) for which it will have the burden of proof at trial. To be entitled to summary judgment, Rolls-Royce and defendants "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Rolls-Royce and defendants also both move for summary judgment on claims or counterclaims for which they will not bear the burden of proof at trial. As to these claims or counterclaims, Rolls-Royce and defendants need only point the court to the absence of evidence of any essential element of the opposing side's claim or counterclaim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant does so, the non-moving party must go

beyond its or his pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the non-movant fails to meet this burden. *See Little*, 37 F.3d at 1076.

B

The court has federal question jurisdiction over Rolls-Royce's Lanham Act claim, 28 U.S.C. § 1331, enabling it to exercise supplemental jurisdiction over Rolls-Royce's state-law claim for misappropriation of trade secrets. A federal court exercising supplemental jurisdiction over a state-law claim must apply the choice-of-law rules of the state in which it sits (here, Texas). *See Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *Boonma v. Bredimus*, 2005 WL 1831967, at *6 (N.D. Tex. July 29, 2005) (Fitzwater, J.) (holding that where federal jurisdiction is premised on federal statute, court must apply choice-of-law rules of state in which it sits to

determine substantive law that applies to pendent state-law claim).

Under Texas choice-of-law rules, "'the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.'" *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 424 (Tex. 1984)). Rolls-Royce brings its trade secret misappropriation claim under Indiana law, and defendants contend that either the law of California (defendants' domicile and principal place of business) or Indiana (Rolls-Royce's principal place of business) should govern. But both California and Indiana have adopted the Uniform Trade Secrets Act ("UTSA"). *Compare* Cal. Civ. Code § 3426 *et seq.* (West 1997) *with* Ind. Code § 24-2-3-1 *et seq.* (2006). And authority from other UTSA jurisdictions is relevant when construing the trade secret law of a state that has adopted the UTSA. *See Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 917-18 (Ind. 1993) ("[C]ase law from other UTSA jurisdictions becomes relevant authority for construction of trade secret law in Indiana."). If there is no conflict of law, the court need not decide whether California or Indiana law governs Rolls-Royce's trade secret misappropriation claim. *See People's Capital & Leasing Corp. v. Munoz*, 2009 WL 4251111, at *2 (N.D. Tex. Nov. 30, 2009) (Fitzwater, C.J.) (holding that where there was no conflict of law, court did not need to decide which state's law controlled) (citing *CMS Energy Res. Mgmt. Co. v. Quicksilver Res.,*

*Inc.*, 2009 WL 1815776, at *8 (Tex. App. June 25, 2009, no pet.) (mem. op.)). Therefore, for simplicity, and because there is no conflict of law concerning the trade secret misappropriation claim, the court in addressing that claim will refer primarily to Indiana law.

III

The court turns first to Rolls-Royce's motion for summary judgment on its reverse palming off claim under the Lanham Act. Rolls-Royce alleges that defendants removed Rolls-Royce packaging from approximately 200 seals made by Rolls-Royce and repackaged and sold them in packaging that bore Hye-Tech's name and FAA PMA parts number.

A

Section 43(a)(1) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . false designation of origin . . . false or misleading representation of fact, which is likely to cause confusion . . . or to deceive as to the . . . origin, sponsorship, or approval of his or her goods . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Section 43(a) is violated when a producer sells goods made by another as if they were its own——a practice known as reverse palming off. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148 n.41 (5th Cir. 2004) (per

- 10 -

curiam).  To recover for reverse palming off, a plaintiff must prove: "'(1) that the [good] at issue originated with the plaintiff; (2) that origin of the [good] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" *Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.*, 457 F.3d 1269, 1277 (5th Cir. 2006) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995)).

B

Rolls-Royce asserts that Kajberouni and his son Armen,[8] both of whom testified on behalf of Hye-Tech as Fed. R. Civ. P. 30(b)(6) witnesses,[9] admitted the first two elements in their sworn deposition testimony.  Kajberouni admitted that Hye-Tech purchased from Heros around 200 "No. 1 bearing seals" that had originally been purchased from a company named Hawker Pacific.  He denied that the parts arrived in Rolls-Royce packaging, but testified that they bore Rolls-Royce part numbers.  According to Kajberouni, Hye-Tech then placed them in different, labeled boxes[10] and "sold [them] as

---

[8]Kajberouni's son oversees the day-to-day operations of Hye-Tech, but is not a named defendant.

[9]Kajberouni——President of Heros, Chief Executive Officer of Hye-Tech, and an owner of both corporations——also testified on behalf of Heros.

[10]The nature of the label is not specified.

Hye-Tech PMA parts." P. App. 4.[11] Armen testified that Hye-Tech "buys Rolls-Royce parts, inspects them, and then sells them under [Hye-Tech's] label." *Id*. at 6. He stated that the parts "came in a Rolls-Royce packaging or Allison packaging," then Hye-Tech "just basically repackaged [them]," and sold them under its own PMA number. *Id*. at 6-7.

Defendants deny that Rolls-Royce's claim has merit. They assert that Kajberouni realized after consulting his purchase records that his deposition testimony was mistaken. He then executed an affidavit explaining that the referenced seals, purchased on June 6, 2004, were not made by Rolls-Royce, but by Rolls-Royce's supplier, Qualiseal, and sold by CBK Aviation, Inc. to Heros. Heros then resold 145 seals to Hye-Tech. Kajberouni maintains that the seals were not genuine Rolls-Royce seals and were not sold in Rolls-Royce packaging. He avers that Qualiseal manufactures seals for Rolls-Royce, Heros, and Hye-Tech, and that the seals were packaged in Qualiseal boxes that bore Qualiseal's logo and part numbers. The seals themselves bore Qualiseal's Commercial and Governmental Entity Code and the appropriate Rolls-

---

[11]In this memorandum opinion and order, references to "P. App." or "Ds. App." are to the appendix filed in support of Rolls-Royce's motion for partial summary judgment or in support of defendants' response to Rolls-Royce's motion, respectively. Other appendixes are identified by referring to the motion to which they relate, e.g., "P. Mot. to Exclude Pflaum App." means the appendix submitted in support of Rolls-Royce's motion to exclude opinions and testimony of Dr. Pflaum.

Royce part number.[12]  Kajberouni avers that Qualiseal is a "sole source" manufacturer, meaning that it is the only entity that can legally manufacture this seal, and that Qualiseal manufactures an identical seal for both Rolls-Royce and Hye-Tech.  He also states that Hye-Tech is an "approved production holder" for the seals, allowing it to sell Qualiseal-produced seals (such as the seals in question) under its PMA number.  Essentially, Kajberouni avers that Hye-Tech and Rolls-Royce simply used the same vendor, and that each company properly resold the seals under its own label and PMA number.

Defendants also rely on photographic evidence of one seal purchased from CBK, one seal sold by Hye-Tech, and one seal sold by Aviall, Rolls-Royce's distributor.  The seal purchased from CBK is identical to the one that Hye-Tech sold.  The photograph of Aviall's seal is unclear, but it appears that the seal bears different numbers.

C

Rolls-Royce contends that defendants cannot create an issue of fact by submitting an affidavit that contradicts prior Rule

---

[12]Although defendants do not state this explicitly, their evidence implies that the Rolls-Royce part number does not indicate the origin of the part but instead indicates its role within the Model 250 engine.  For example, the photographs appended to Kajberouni's affidavit show that the seals sold by three different companies all bear the same part number.  Thus the court presumes that the Rolls-Royce part number does not of itself indicate that Rolls-Royce manufactured the seals that contain the part number.

30(b)(6) deposition testimony.  A party cannot "defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984)).  "When the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict." *Copeland v. Wasserstein, Perella, & Co.*, 278 F.3d 472, 482 (5th Cir. 2002).  "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).  But "[if] an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S. Erectors*, 72 F.3d at 496 (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)).  Permissible supplementation includes providing "greater detail or additional facts not previously provided in the

deposition." *Id.*

Kajberouni's affidavit is not a conclusory refutation of his prior testimony. The statement primarily supplements, rather than contradicts, his deposition. In his deposition, Kajberouni's testimony about the origin of the seals was ambiguous; he denied that they arrived in Rolls-Royce or Allison packaging, but instead came in "packaging with [the] Allison part number on it." Ps. App. 3. He was also asked where the seals were manufactured, but his response was not recorded. *Id.* at 4. Kajberouni's affidavit explains that the parts came in Qualiseal-labeled boxes and also bore the Allison part number. In the deposition, Kajberouni estimated that Hye-Tech sold approximately 200 seals purchased from another company; in his affidavit, he stated that Hye-Tech sold exactly 145.

Kajberouni's affidavit conflicts with his deposition testimony on only one point: the party from whom Heros purchased the seals. During the deposition, Kajberouni testified that Heros purchased the seals from Hawker Pacific, while in the affidavit, he averred that the seals were purchased from Qualiseal. The affidavit offers a sufficient explanation for the difference. Following his deposition, Kajberouni reviewed the specific purchase order relating to the seals. The additional facts provided in the affidavit expand on and clarify Kajberouni's deposition testimony. The court will therefore consider his subsequent affidavit despite

its differences with his deposition testimony. *See Bowe v. Exide Corp.*, 2001 WL 705881, at *4 (N.D. Tex. June 18, 2001) (Fitzwater, J.) (holding that faulty memory was sufficient explanation for difference in testimony); *see also Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1230 (N.D. Iowa 1994) (holding that refreshed memory was sufficient reason to consider affidavit contradicting earlier testimony). Kajberouni's affidavit testimony is not, in this respect, an effort to create a sham issue of fact. *See Doe*, 220 F.3d at 386 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983)).[13]

Kajberouni's affidavit is evidence that the parts in question did not originate with Rolls-Royce, as required to establish a reverse palming off claim under the Lanham Act. The affidavit presents a genuine issue of material fact, and therefore Rolls-Royce has not established beyond peradventure that all the elements of its Lanham Act claim have been established.

Even if the court does not consider Kajberouni's affidavit, Rolls-Royce's motion must be denied. Rolls-Royce's only evidence

---

[13]The affidavit does contradict Armen's deposition testimony. Armen testified that Hye-Tech would purchase parts contained in Rolls-Royce or Allison packaging, repackage them, and sell them under Hye-Tech's PMA number. In his affidavit, Kajberouni stated "[n]either H[eros] nor Hye-Tech labeled Rolls-Royce parts as their own, nor did they substitute their own packaging for that of Rolls-Royce." Ds. App. 852. Defendants do not explain this difference. But despite the contradiction, the affidavit is primarily a supplement to Kajberouni's original testimony, not a cursory refutation of Armen's testimony.

of reverse palming off is the testimony of Kajberouni and Armen. But this testimony is inconsistent and far from clear. Kajberouni denied that the parts came in Rolls-Royce packaging, and he did not identify in his deposition who manufactured the seals, only they were purchased from Hawker Pacific. Armen testified that Hye-Tech re-packaged Rolls-Royce parts for sale as Hye-Tech parts, but he did not refer to any particular set of parts. Rolls-Royce alleges misconduct related to specific seals sold to specific, identified purchasers. Armen's testimony does not foreclose the possibility that Hye-Tech did not re-label the parts in question.[14]

Because the court must view this evidence in the light most favorable to defendants as the nonmovants, *see, e.g., Morgan v. Plano Independent School District*, 589 F.3d 740, 745 (5th Cir. 2009), the evidence is insufficient, even without Kajberouni's affidavit, to meet Rolls-Royce's burden to prove beyond peradventure that the goods sold by defendants in fact originated with Rolls-Royce.

Accordingly, the court denies the ground of Rolls-Royce's motion for summary judgment in which it seeks to establish the right to recover on its reverse palming off claim.

---

[14]Kajberouni did state that the incident about which he was testifying was the only one that involved the repackaging of parts.

Rolls-Royce also alleges a claim for misappropriation of trade secrets. Because Rolls-Royce and defendants each move for summary judgment concerning this claim, the court will consider the motions in tandem.

A

Before addressing the merits of Rolls-Royce's claim, the court must identify the documents at issue. Defendants move to strike what they contend are "new claims" presented in Rolls-Royce's summary judgment motion. They object to the list of trade secrets at issue provided in the appendix to Rolls-Royce's motion, contending that it differs markedly from the one provided with Rolls-Royce's amended complaint. In the appendix to its amended complaint, Rolls-Royce identified 92 part drawings and 4 OILs as the misappropriated trade secrets. Rolls-Royce also referred to part of that list in the body of its amended complaint, labeling that subsection "Group I Drawings." In a footnote to the list of Group I Drawings, Rolls-Royce states: "This list is provided for specific notice to the Court and the Defendants of examples of such misappropriation. Additional discovery may result in supplementation and/or amendment of this list." Am. Compl. 10 n.9. Rolls-Royce did not supplement or amend the list before it filed its motion for partial summary judgment, but it now presents an altered list in its motion. According to defendants, Rolls-Royce's

motion omits all 4 OILs and 82 of the part drawings listed in the amended complaint, but adds 5 new OILs and 109 part drawings. Defendants argue that this alteration effectively adds new misappropriation claims. They maintain that Rolls-Royce had ample opportunity to supplement its list of documents, that the alteration has deprived them of adequate notice, and that Rolls-Royce is attempting to "reshape this entire litigation." Ds. Mot. Strike New Claims 6.

The court disagrees. Defendants were on notice regarding each of the documents listed in Rolls-Royce's summary judgment motion appendix. During discovery, defendants served an interrogatory asking Rolls-Royce to identify the technical documents that it alleged that defendants had misappropriated. Rolls-Royce responded by submitting a list that included each document described in Rolls-Royce's summary judgment motion.

Defendants contend that Rolls-Royce first inspected the part drawings and OILs in defendants' possession in August 2006 as part of discovery in another lawsuit. They posit that Rolls-Royce cannot adequately explain its delay in revising the list of documents because it has known for over three years of defendants' possession of these documents. Defendants maintain that Rolls-Royce's delay has prejudiced them by depriving them of the opportunity to move for summary judgment on what defendants

characterize as new claims.[14]

Under Rule 8(a), Rolls-Royce was required to plead a short and plain statement of its misappropriation claim. Rolls-Royce pleaded such a claim in its amended complaint. The documents to which Rolls-Royce refers in its summary judgment motion are evidence in support of Rolls-Royce's misappropriation claim; they are not new claims. Rolls-Royce was not required to plead in its amended complaint all of the evidence that supported its misappropriation claim. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 257, 266 (5th Cir. 2007) (noting that complaint that asserted only general claims of trade secret misappropriation, and that trade secrets at issue were precisely identified only during discovery). Rolls-Royce can rely on evidence not specifically identified in its amended complaint because it disclosed the evidence during discovery. *Cf. Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008) (holding that new evidence of discrimination not mentioned during discovery could not be relied on to defeat summary judgment).

Although the court will not permit Rolls-Royce to "rely on a ground of which defendants had no notice and thus could not have

---

[14]According to defendants, 59 of the newly identified part drawings pertain to the Model 501 engine instead of the Model 250 engine. Because the Model 501 engine was not previously at issue in this case, defendants maintain that they lacked sufficient notice of these claims. Because the court is striking the inclusion of these 59 part drawings, *see infra* § IV(B), defendants' arguments are moot in this respect.

fairly addressed in their motion," *Jacobs v. Tapscott*, 2006 WL 2728827, at *4 n.3 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008), this is not such a case. Defendants had adequate notice concerning the scope and grounds for Rolls-Royce's misappropriation claim. Not only were the documents listed in response to an interrogatory, Rolls-Royce noted in its amended complaint that "[a]dditional discovery may result in supplementation of this list." Am. Compl. 10 n.9. The list included in the amended complaint was explicitly intended only to serve as an example. *See id*. The augmented portions of the list do not constitute a new legal theory for relief.

The court therefore denies defendants' motion to strike Rolls-Royce's new, unpleaded claims.

B

In Rolls-Royce's summary judgment motion, the list of part drawings at issue includes not only drawings of the Model 250 engine (the focus of this litigation to date), but also 59 drawings related to another Rolls-Royce engine: the Model 501. Rolls-Royce moves to delete these Model 501 part drawings from its summary judgment motion, contending that they were essentially included in error. Defendants agree to the request to delete these drawings. The court therefore grants Rolls-Royce's motion to delete certain part drawings from its motion for partial summary judgment. By the

court's count, 60 part drawings[15] and 5 OILs[16] remain at issue.[17]

V

Having clarified the list of documents at issue, the court turns to the merits of the parties' summary judgment motions. Rolls-Royce maintains that it is entitled to recover on this claim. Defendants contend that the claim is time-barred.

A

Because the statute of limitations is an affirmative defense, defendants will have the burden of proof at trial. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988).[18]

---

[15]I.e., 92 - 82 + 109 - 59 = 60.

[16]These are described below as AMC-OILs.

[17]Defendants argue that they did not use some of the remaining part drawings and that they could not have been unjustly enriched, as Rolls-Royce alleges. But the UTSA makes clear that use is not required for a misappropriation claim. Instead, defendants need only have "acquired" the trade secrets. *See* Indiana Code § 24-2-3-2 (2006). The fact that a part drawing was not used may affect an issue such as the calculation of damages, but this question has not been fully briefed, and the court will not address it.

[18]The court applies Texas choice-of-law rules. *See supra* § II(B). For procedural matters, such as limitations, Texas applies the law of the forum state. *See, e.g., Porter v. Charter Med. Corp.*, 957 F. Supp. 1427, 1432 n.2 (N.D. Tex. 1997) (McBryde, J.); *see also Sun Oil Co. v. Wortman*, 486 U.S. 717, 722, 727-28 (1988) (holding that statute of limitation is procedural for choice-of-law purposes). The court applies the Texas statute of limitations pursuant to Texas' choice of law rules, even though the court applies the substantive law of either Indiana or California to the trade secret misappropriation claim. *See Alvarado v. Ford Motor Co.*, 2009 WL 2923070, at *4 (E.D. Tex. Sept. 8, 2009) ("Pursuant to Texas' choice of law rules, questions of substantive law are controlled by the laws of the state where the cause of action arose, but remedial and procedural matters are governed by the laws

Defendants must satisfy the beyond peradventure standard to obtain summary judgment dismissing the claim based on limitations. *See supra* § II(A).

Typically, "limitations commences when the wrongful act occurs resulting in some damage to the plaintiff." *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990). But in the case of trade secret misappropriation, "[a] person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation *is discovered* or by the exercise of reasonable diligence *should have been discovered*." Tex. Civ. Prac. & Rem. Code Ann. § 16.010 (Vernon 2002) (emphasis added). In other words, the statute of limitations "defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action." *Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 365 (5th Cir. 2000). Further, "[a] misappropriation of trade secrets that continues over time is a single cause of action, such that additional thefts augment the single claim rather than constitute new and distinct claims." *Raytheon Co. v. Indigo Sys. Corp.*, 653 F.Supp.2d 677, 683 (E.D. Tex. 2009) (internal quotation marks omitted) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 16.010(b);

---

of the forum state. The statute of limitations is a procedural issue. Thus the Texas statute of limitations applies because plaintiff has brought this action within the state of Texas." (internal citations omitted)).

*Seatrax*, 200 F.3d at 365). When deciding whether the limitations period has commenced, "the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (citing *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734-35 (Tex. 2001)).

The statute of limitations begins to run not just when a plaintiff "learns of actual causes and possible cures," but also when a plaintiff "learns of a wrongful injury . . . even if the claimant does not yet know: the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners LP*, 146 S.W.3d 79, 93 (Tex. 2004) (citations omitted) (discussing "discovery rule" exception to general statute of limitations). The reasonable diligence requirement means that Rolls-Royce is charged with "the knowledge that it would have obtained through a reasonable investigation from the time that it was on notice that a reasonable investigation was necessary[.]" *Raytheon Co.*, 653 F.Supp.2d at 688. "A party need not come to court knowing the full scale of [its] adversary's alleged wrongs; the machinery of discovery should be used to develop the case as it proceeds towards trial." *Id*.

The statute of limitations for Rolls-Royce's misappropriation claim therefore began to run when Rolls-Royce, had it exercised reasonable diligence, should have discovered that defendants were

misappropriating its trade secrets.  *See id.* at 683.  Rolls-Royce filed this lawsuit on April 26, 2007.  To obtain summary judgment, defendants must establish beyond peradventure that Rolls-Royce discovered or should have discovered, through the exercise of reasonable diligence, the misappropriation before April 26, 2004.

B

Defendants rely on various events before April 26, 2004 that they contend should have indicated to Rolls-Royce that its proprietary documents may have been misappropriated and that defendants, in particular, may have possessed proprietary documents.  Rolls-Royce challenges defendants' evidence on the basis that it relates to non-proprietary information, not to the specific proprietary documents at issue.

Defendants contend that Rolls-Royce's focus shifted in the mid-1990s from making and selling Model 250 engines to making and selling repair parts.  Around that same time, Rolls-Royce began to notice that various competitors manufactured and sold replacement parts for the Model 250 engine, gaining PMA by using data Rolls-Royce considered proprietary.  Defendants rely heavily on a 1994 internal memorandum authored by Rolls-Royce's after-market sales manager, Tim Sweeney ("Sweeney") (the "Sweeney Memorandum").  In it, Sweeney stated that a number of competitors possessed nearly complete data packages for specific versions of the Model 250 engine and for "Model 250 common parts."  Ds. App. 33.  The Sweeney

Memorandum reported that the "Aftermarket Sales [group]" within Rolls-Royce had been working for a year to "correct procedures and practices that have been allowing [Rolls-Royce] data to be released to the general public without restriction." *Id.* The purpose of the Sweeney Memorandum was to "document [that] investigation, cite some of the actions taken and make additional recommendations." *Id.* The memorandum explained that, prior to adoption of an internal policy in 1990 (and even afterward), Rolls-Royce regularly provided design data to its employees without following any safeguards. Additionally, some design data were available under the Freedom of Information Act ("FOIA") and the Competition in Contracting Act of 1984 because of the United States Government's use of the Model 250 Engine. Sweeney opined that any design data previously disclosed were in the public domain and that Rolls-Royce could only "do [] damage control and learn from [its] mistakes." *Id.* at 34.[19]

Defendants also rely on a 1991 letter written by William Fesler ("Fesler"), a Rolls-Royce manager responsible for the Model 250. Fesler stated in the letter that complete sets of Model 250

_____

[19]Defendants interpret this statement to mean that any documents created before 1994 are in the public domain. Almost all the part drawings at issue were created before 1994 (although defendants did not acquire some documents until later). Applying the "heavy" beyond peradventure standard, the court cannot say that Sweeney's statement regarding what was in the public domain is conclusive in this respect. Moreover, the Sweeney Memorandum is not sufficiently clear concerning which documents Sweeney was discussing.

data were being used by repair facilities that were not part of the Rolls-Royce network. *Id.* at 181. Fesler also wrote a letter in 1999 to Rolls-Royce's field representatives and AMCs informing the AMCs that proprietary documents had been released to third parties and instructing them to maintain the confidentiality of Rolls-Royce's proprietary information, including OILs. Fesler also indicated that he was aware of rumors that unauthorized companies were in possession of proprietary documents as early as the late 1980s.

Rolls-Royce responds that none of this evidence indicates misappropriation *by defendants*. It asserts that the documents now at issue are not the ones referenced in the Sweeney Memorandum, which, by its own terms, concerned documents that had become public. Rolls-Royce also posits that the wrongdoing of third parties does not trigger the limitations period in this case because causes of action against separate parties operate distinctly.

Rolls-Royce's knowledge that *some companies* were misappropriating its trade secrets did not require it to investigate further *defendants'* possible misappropriation of its trade secrets. A reasonable jury could find that, in the aftermarket parts industry, the problem Rolls-Royce identified was too widespread and diffuse to put Rolls-Royce on notice of the specific injury about which it now complains. A reasonable jury

could also find that a reasonable investigation based only on this general information would not have led Rolls-Royce to discover that *defendants* had misappropriated its trade secrets.

But these conclusions are not fatal to defendant's limitations defense if they can establish beyond peradventure that Rolls-Royce's general knowledge of misappropriation of proprietary documents, combined with other information known or available to Rolls-Royce before 2004, should have led Rolls-Royce to investigate and discover at least some of defendants' alleged misappropriation. It is to this question that the court now turns.

C

1

In 1991, Heros sent a letter to Rolls-Royce (the "1991 letter") in which it asked Rolls-Royce to clarify a procedure that was described inconsistently in two separate documents: a 250-C20 Series Overhaul Manual and Distributor Overhaul Information Letter (DOIL) #8. Rolls-Royce responded by letter identifying DOIL #8 as proprietary, refusing to discuss the procedure, but suggesting that Heros could get help from Rolls-Royce's parts distributor or "the person who sold [Heros] the DOIL information." Ds. App. 741. Thus Rolls-Royce was directly notified that Heros had unauthorized access to some Rolls-Royce proprietary documents.

Rolls-Royce contends that this notice is irrelevant because it does not refer to the specific proprietary documents at issue in

this case.    In general, Rolls-Royce asserts that defendants'
arguments fail to distinguish between DOILs (produced in the 1980s)
and Approved Maintenance Center Information Letters ("AMC-OILs")
(produced in the late 1990s), on which Rolls-Royce's claim is based
in part.[20]

Defendants have not established beyond peradventure that the
1991 letter regarding DOIL #8 should have led Rolls-Royce to
investigate and discover defendants' alleged misappropriation of
the five AMC-OILs at issue.   The AMC-OILs had not yet been written,
and a reasonable jury could therefore find that they had not yet
been misappropriated.[21]    The AMC-OILs at issue were released in

_____

[20]Rolls-Royce changed its relationship with service centers and
distributors on several occasions.  From the mid-1960s until 1985,
Rolls-Royce licensed Approved Customer Service Centers for engine
repairs.    In  1986  it  replaced  the  service  centers  with  29
Authorized Maintenance Overhaul Centers ("AMOCs").  Through much of
this period, Rolls-Royce provided drawings and DOILs to the AMOCs
on request.   Defendants state that, as Rolls-Royce expanded into
the aftermarket parts business in 1994-95, it replaced the AMOCs
with 25 Authorized Maintenance Centers ("AMCs").  When Rolls-Royce
switched from AMOCs to AMCs, it replaced the DOILs with AMC-OILs.
Defendants  allege  that  this  was  an  anticompetitive  effort  to
"recapture" Model 250 data that had already been released in the
public domain.    Ds. Resp. Br. to P. Mot. for Partial Sum. J. 26.
Defendants maintain that the AMC-OILs are merely re-labeled DOILs.
They seek to present evidence that all changes are cosmetic and
that  no  significant  engineering  information  has  been  altered.
Although Rolls-Royce admits similarities, it points to evidence
that the AMC-OILs contain some new information not found in the
documents they replaced.   *See infra* § VI(A).

[21]Defendants also contend that their 1988 purchase of a former
AMOC  provided  Rolls-Royce  with  notice  of  their  possession  of
alleged proprietary information.  But as with DOIL #8, the purchase
says nothing of the AMC-OILs that were produced many years later.

1996, 1997, and 1999. Because the AMC-OILs were new documents issued to a different group of companies under a new set of safeguards, Rolls-Royce's knowledge that defendants had gained access to old documents does not establish that an investigation was required regarding the new documents.

The court reaches a different result, however, concerning 35 of the 60 part drawings at issue. Defendants have established beyond peradventure, as evidenced by the Sweeney Memorandum, that Rolls-Royce was aware by at least 1994 that unauthorized companies possessed Rolls-Royce data. A reasonable jury could only find that the 1991 letter gave Rolls-Royce direct notice that Heros possessed information that Rolls-Royce then considered proprietary. *See* Ds. App. 741 (stating that "the [DOIL] that you possess is a proprietary document."). Defendants have established that these two pieces of information should have led Rolls-Royce to suspect that Heros might have misappropriated trade secrets and that Rolls-Royce should have investigated further. Any reasonable investigation would have uncovered all the part drawings then in defendants' possession. As noted, the limitations period on a misappropriation claim commences when a potential plaintiff was "on notice that a reasonable investigation was necessary[.]" *Raytheon Co.*, 653 F.Supp.2d at 688. A reasonable jury could only find that Rolls-Royce knew or should have known of the existence of an injury, even if it did not know the cause or the full extent.

Therefore, defendants have established beyond peradventure that the statute of limitations on Rolls-Royce's misappropriation claim began to run in 1991 for any part drawings that Rolls-Royce would have discovered with reasonable investigation, i.e., drawings that Heros possessed at that time. The summary judgment record establishes that, in 1988, Heros acquired 35 of the part drawings at issue[22] from Hamilton Standard, a former Authorized Maintenance Overhaul Center ("AMOC"), as part of a purchase of Hamilton Standard's Model 250 operation. Thus defendants have established beyond peradventure that the statute of limitations precludes Rolls-Royce's misappropriation claim to the extent based on these 35 drawings.[23]

2

Regarding the remaining part drawings, defendants have demonstrated that, in 1994, Heros purchased three drawings *at*

---

[22]This number was calculated according to the information contained in Kajberouni's affidavit. *See* Ds. App. 852-54.

[23]Additionally, Kajberouni avers in his affidavit that Allison representatives were aware of Heros' acquisition of Hamilton Standard's Model 250 operations in 1988, and that he notified Allison's distributor's representatives personally. Defendants also cite summary judgment evidence that, in the early 1990s, Heros applied for AMOC status through one of Rolls-Royce's distributors. That distributor sent representatives to Heros and observed the Model 250 technical data then in Heros' possession. This evidence further supports the conclusion that a reasonable jury could only find that Rolls-Royce knew or should have known of defendants' alleged misappropriation of these 35 part drawings before 2004.

*public auction* from Aviall, Rolls-Royce's parts distributor.[24]
Defendants have established beyond peradventure that Rolls-Royce
should have discovered this sale because it occurred at an
advertised public auction held in connection with Aviall's move
from California to Texas, and the seller was Rolls-Royce's parts
distributor. Rolls-Royce was already aware that its proprietary
information was being routinely released to the public. It should
have known of its distributor's auction of proprietary Rolls-Royce
information. This knowledge should have led to an investigation,
which would have led to the discovery of the misappropriation of
the part drawings. Thus, as to the part drawings Heros purchased
at public auction in 1994, the court holds that defendants have
established beyond peradventure that Rolls-Royce's misappropriation
claim is barred by limitations.

3

Defendants also point out that they used several of the part
drawings to obtain PMA or DER repair authorization from the FAA
more than three years before this lawsuit was filed.[25] The FAA
maintains a website that contains a public database of the PMAs it
grants. The database is searchable by make, PMA holder, part name,
number, approval basis, and aircraft engine. Internal Rolls-Royce

---

[24]Part Drawing Nos. 23008566(A), 23033876(E), and 23037447(B).

[25]Heros received its first DER repair authorization on August
17, 1992, and defendants' most recent FAA approval was a PMA dated
February 12, 2002.

emails from July 2002 indicate that Rolls-Royce had already been monitoring the FAA's PMA database for "several years." Ds. App. 563. Defendants have established beyond peradventure that Rolls-Royce should have known of the evidence of potential misappropriation available in this public database. Of the remaining part drawings at issue, Rolls-Royce could have discovered that PMA was granted on the basis of identicality for six additional part drawings more than three years before Rolls-Royce filed suit.[26] Because Rolls-Royce agrees that identicality requires "access to proprietary Rolls-Royce Design Data," Am. Compl. 11, it should have discovered and investigated the alleged misappropriation. The court therefore holds that Rolls-Royce's claim as to these six additional drawings is barred by limitations.

D

In summary, the court holds that Rolls-Royce's misappropriation claim regarding the OILs is not time-barred, but that the claim regarding a total of 44 of the 60 part drawings at issue is barred.[27] As to the remaining 16 part drawings, defendants

_____

[26]Part Drawing Nos. 23039909(B), 23034102(C), 6898784(C), 6899050(C), 6899051(D), and 23037444(A). Additionally, defendants received PMA for No. 23003101(B), but this drawing is no longer at issue because it was obtained from Hamilton Standard.

[27]Defendants also argue that, because they have advertised their Model 250 repair capabilities for years, Rolls-Royce should have been on notice of potential misappropriation. The court holds that this argument does not meet the heavy beyond peradventure standard because defendants' services could have been based on a large amount of information in the public domain. Moreover, this

are not entitled to summary judgment on limitations grounds.[28]
Defendants provide evidence that these drawings were produced prior
to 1994.  But defendants have not established beyond peradventure
that Rolls-Royce should have discovered the misappropriation of
these drawings prior to three years before it filed suit.  Because
a question of material fact remains as to the remaining 16
drawings, the court denies defendants' motion with respect to those
part drawings.

VI

Having denied defendants' limitations-based motion for summary
judgment related to the misappropriation of the five AMC-OILs, the
court now considers whether Rolls-Royce is entitled to summary
judgment establishing its right to recover against defendants for
misappropriating the five AMC-OILs, and whether defendants are
entitled to summary judgment dismissing Rolls-Royce's claim for
misappropriation of the five AMC-OILs on the merits.

---

general advertising does not indicate direct misappropriation as
opposed to other means of obtaining information, such as through a
FOIA request.

    [28]Claims related to the following part drawings, identified by
part number and revision, are not barred by limitations: Nos.
6898679(E), 6898762(A), 6899076(A), 6899088(C), 6899096(A),
6899102(A), 6899118(I-R), 23001832(E), 23001967(J), 23031268 (C),
23032286(A), 23034601(C), 23035139(D), 23039095(D), 23053323(A),
and 6853540(J).

As a threshold matter, the court must decide whether certain parts of the testimony of Reno, a defense expert, are admissible. This is because, in addressing Rolls-Royce's motion, the court must first determine whether the OILs are trade secrets. And a preliminary question involved in that determination is whether the AMC-OILs at issue are materially different from earlier documents (DOILs) that may have become part of the public domain. Relevant to this question is whether the court can consider the expert testimony of Reno that Rolls-Royce moves to exclude.

Reno worked as an engineer at Rolls-Royce for 29 years and as an engineer at other aircraft parts repair shops and manufacturers for another 9 years. Reno proposes to testify as to the difference between various OILs issued by Rolls-Royce.

DOILs, first issued in 1970, were letters published to provide detailed part repair procedures and information. In the mid-1990s, after Rolls-Royce purchased the Model 250 operation from Allison, Rolls-Royce made significant changes in its distribution system. The old network of AMOCs was canceled, and Rolls-Royce created a new network of Authorized Maintenance Centers ("AMCs"). At the same time, Rolls-Royce re-labeled the DOILs as AMC-OILs. These documents were again relabeled "Parts Repair Procedure Letters" ("PRPLs") in December 2003, and Rolls-Royce issued a letter describing AMC-OILs as "obsolete." Reno's testimony compares

corresponding DOILs, AMC-OILs, and PRPLs, concluding, with minor exceptions, that there are no major differences in the corresponding documents from an engineering perspective.

B

The court decides Rolls-Royce's motion to exclude opinions and testimony of Reno in its role as gatekeeper concerning the admissibility of expert testimony. *See, e.g., Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). To be admissible under Fed. R. Evid. 702, expert testimony must be both relevant and reliable. *See, e.g., id.* "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993)). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 591). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93). An expert must also be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589

F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702).   The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592.

Rolls-Royce does not object to Reno's qualifications or the reliability of his methods.  Instead, it challenges the relevance of his testimony and maintains that his analysis does not require any expertise.

C

Rolls-Royce first objects to the introductory portion of Reno's report, which it describes as historical background information that is irrelevant.  The court dealt with a similar issue in a previous opinion in this case.  *See Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.) (holding that expert opinion can be admitted if it serves teaching function).  The court concluded that "[i]f an expert distills a complicated subject into language a jury can understand, and that subject is relevant, he can be admitted as a 'teaching witness.'"  *Id.* (citing *Miller v. Holzmann*, 563 F.Supp.2d 54, 91-92 (D.D.C. 2008)).  The court holds that Reno's introduction distills a complicated subject——background on Rolls-Royce's technical documents——into language that a jury can better understand.  The technical documents and their contents are at issue in this case.  Rolls-Royce's motion with respect to this

portion of the opinion is therefore denied.

D

Rolls-Royce also objects to the main body of Reno's testimony, arguing that it is not helpful to the trier of fact because it merely compares documents as any layman or juror could do. The central premise of Rule 702 is that expert opinion testimony should be allowed only when specialized knowledge is necessary to assist the trier of fact in understanding evidence. If the trier of fact can understand evidence on its own, without the help of an expert, expert testimony is inappropriate. *See Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (holding expert testimony about plaintiff's ability to operate machine was inappropriate where jury could be shown video of plaintiff operating machine).

The court concludes that expert testimony is necessary to assist the jury in understanding the evidence to which Reno's expert testimony pertains. The manuals in question describe complex aircraft part maintenance procedures. They are produced by persons with specialized knowledge, to be used by persons with specialized knowledge. They are not easily understood by laymen. A jury would have difficulty determining the differences between the documents without the benefit of expertise, such as that offered by Reno. Additionally, Reno opines as to the *engineering* significance of any changes. This opinion has probative value that exceeds what a simple visual comparison of the documents can

afford.

E

Finally, Rolls-Royce contends that Reno's opinions are irrelevant because he does not relate the processes in the OILs to those that defendants actually used. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401; *see also, e.g., Pipitone*, 288 F.3d at 245. Rolls-Royce must establish that the allegedly misappropriated AMC-OILs are trade secrets. Defendants contend they are not trade secrets because they are functional copies of documents (DOILs) that are already in the public domain. Reno's testimony relates directly to the issue of the novelty of the information.[29] This evidence would assist the jury in determining whether the AMC-OILs are trade secrets, and is therefore relevant.

Accordingly, Rolls-Royce's motion to exclude the opinions of

---

[29]It appears that in some cases Reno compares the original OILs to the latest revisions, the PRPLs. The PRPLs are themselves revisions of the five AMC-OILs that Rolls-Royce asserts were misappropriated. The differences and similarities between the original DOILs and the PRPL revisions are less important than the differences and similarities between the original DOILs and the five AMC-OILS at issue in the case. But Reno's analysis is probative of changes that have (or have not) been made to the original DOILs. It is fair to infer that similarities between the original documents and the latest documents exist between the originals and the intermediate revisions.

Reno is denied.[30]

VII

The court now turns to the question whether Rolls-Royce has established beyond peradventure that the five AMC-OILs in question are trade secrets and, if it has not met this burden, whether defendants are entitled to summary judgment dismissing Rolls-Royce's misappropriation of trade secrets claim on the merits.

A

Under the UTSA, something is a trade secret if

> (1) it is information, (2) which derives independent economic value, (3) that is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts, reasonable under the circumstances, to maintain its secrecy.

*Credentials Plus, LLC v. Calerone*, 230 F.Supp.2d 890, 900 (N.D. Ind. 2002).  In other words, trade secrets must not be generally known and must be subject to reasonable efforts to maintain their secrecy.  *See Tubos de Acero De Mex., S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 483 (5th Cir. 2002) (applying UTSA) ("'A disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade

---

[30]Reno's proposed testimony also concerns numerous OILs that are no longer at issue.  Unless defendants can establish at trial why that testimony remains relevant, it will be subject to exclusion.  The court is not granting Rolls-Royce's motion in this respect, however, because defendants may be able to establish that some opinions are still admissible.

secret.'" (quoting *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 183 (1988))). The earlier DOILs used as templates for the AMC-OILs were in the public domain. Rolls-Royce admits that any DOILs issued before late 1994 without proprietary rights legends are not protected as trade secrets.[31] *See* P. Resp. to Ds. Mot. Sum. J. 3. Therefore, the AMC-OILs cannot be trade secrets if they are essentially the same as documents in the public domain.

Defendants maintain there are no material differences between the documents.[32] They point to a Rolls-Royce training document that states: "The AMC-OIL is the same as a Distribution Overhaul Information Letter (DOIL). When we switched from a system of distributors to the current AMC system the name of the bulletins was changed." Ds. App. 340. Further, one of Rolls-Royce's Rule 30(b)(6) witnesses testified that DOILs and AMC-OILs were canceled only because they were found to be outside of the network, and that

---

[31]Evidence that DOILs were in the public domain is overwhelming and largely uncontroverted. Rolls-Royce merely seeks instead to distinguish DOILs from AMC-OILs. The court particularly notes the 1991 letter, in which Fesler admits that Rolls-Royce was aware at the time that "complete sets of [Model 250 DOILs]" were in public circulation. Ds. App. 181. Defendants have also presented uncontroverted testimony from both the former manager of Rolls-Royce's Model 250 sales division and the former supervisor of Rolls-Royce publications that Rolls-Royce placed a complete set of Model 250 DOILs in the Indianapolis Public Library and continued to update the set to ensure that the documents would be in the public domain, allowing Rolls-Royce to sell the engines overseas.

[32]Although defendants do not cite Reno's expert report in their summary judgment motion, the court will consider it as part of the record. The court is aware of the report due to the motion to exclude, decided *supra* at § VI.

Rolls-Royce then reissued the "proprietary information" as PRPLs. *Id.* at 482. Defendants characterize this as an attempt to recapture data in the public domain.

Rolls-Royce counters that the information added to the AMC-OILs distinguishes them from the old DOILs and allows the AMC-OILs as a whole to qualify as protected proprietary information. Rolls-Royce points to specific processes that were added or amended in the new AMC-OILs. *See* P. Resp. to Ds. Mot. Sum. J. 11. It essentially contends that so long as new information is added to a document previously in the public domain, the revised document can be entirely proprietary.[33] In other words, Rolls-Royce does not assert that only the new information is a trade secret; instead, it maintains that the addition of new information transforms the entire document into a proprietary document.

### B

A compilation of information, even if all of the information is generally known, can be a trade secret. *See Minn. Mining & Mfg.*

_____

[33]Rolls-Royce cites another case, in which Rolls-Royce was the defendant, and the court reached this conclusion. The court held that "Rolls-Royce has taken documents that were in the public domain, added information to those documents, then protected the revised documents' secrecy . . . . [T]he revised document—now a combination of public and secret information—may be regarded as a trade secret." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 2009 WL 3161168, at *3 (W.D. Mo. Sept. 28, 2009). *AvidAir* is not binding on this court, and the court is not persuaded to follow this conclusion. The court was applying Indiana law, and it neither stated its reasoning nor cited case law to support this conclusion.

*Co. v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) (applying the UTSA). But for that compilation to be a trade secret, the information must be combined in a unique way by which the value of the information is increased. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) ("Hence, even if all of the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret.") (applying the UTSA). If public information is merely compiled in a new document, that document does not then become a trade secret. *See State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 675 (Ohio 1997) (holding that memoranda did not constitute trade secrets in their entirety because they contained information already made public) (applying UTSA).

A reasonable jury could not find that Rolls-Royce transformed DOILs into AMC-OILs by compiling public information in a unique and value-producing manner. Instead, it could only find that Rolls-Royce took a document in the public domain, made some cosmetic changes, and added a relatively small amount of new information in an effort to recapture the entire document as a trade secret.[34]

---

[34]For instance, although AMC-OIL 3 (Rev. 16) states that it is a "COMPLETE revision," it notes that the only substantive change is to "Add[] Section 34," which consists of nine pages added to the end of a 114-page document. P. App. 66. Similarly, AMC-OIL 7 (Rev. 7) states that it is a complete revision, but the listed changes are these: changing the name of the company, adding Section O (three pages of the 33-page document), changing the name from

Because the purpose of trade secret law is to encourage innovation and development, protection should not extend beyond the limits needed to protect genuine trade secrets. *See Am. Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-82 (1974)). Reno opines that the five AMC-OILs at issue contain no major engineering differences when compared to their predecessor DOILs. *See* Ds. Mot. to Exclude Reno App. 3, 5, 6, 8, 20, 30, 32, and 34. The revisions do not alter the ideas contained in the documents, and they are "nearly technically the same." *Id*. at 20.

Rolls-Royce has failed to establish beyond peradventure that the AMC-OILs are not functionally the same as their predecessors, and it has failed to produce evidence that creates a genuine issue of material fact on this point. If the AMC-OILs are functionally the same (the summary judgment evidence would not enable a reasonable jury to make any other finding), and if the predecessor DOILs are in the public domain, then it follows that the AMC-OILs are as well. "Because this same information was readily available from another source, it does not qualify as a trade secret as a matter of law." *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 29 (2d Cir. 2010) (applying UTSA) (holding paper printouts of data files could not be trade secrets if data files contained

---

"DOIL 7" to AMC-OIL 7, reformatting the entire letter, and adding a statement of proprietary rights to each page. *See id*. at 178.

public information and printouts were not "materially different").
The UTSA states that a "'[t]rade secret' means *information*." Ind.
Code § 24-2-3-2 (2006) (emphasis added). Trade secret status is
determined (in part) by the general public knowledge or ready
availability of the information or idea, not by the particular
document in which it is found. Trade secret protection cannot be
gained simply by a change in form. *See Nationwide*, 606 F.3d at 29
("It is not the medium that matters here, but whether the
information itself was adequately protected—and it was not.
Because this same information was readily available from another
source, it does not qualify as a trade secret as a matter of
law."). Instead, to "create" a trade secret, information in the
public domain must be altered in a way that transforms the value of
the ideas. Rolls-Royce has failed to establish beyond peradventure
that the alterations of the DOILs in question were sufficient to
transform entire documents[35] found in the public domain into trade
secrets.

Accordingly, the court holds that Rolls-Royce has failed to
establish beyond peradventure that the five AMC-OILs are trade
secrets, because a reasonable jury could find that they are merely

---

[35]It is possible that only the new sections of the AMC-OILs
could be trade secrets, but Rolls-Royce does not make this
assertion. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581,
583-84 (7th Cir. 2002) (applying the UTSA) (holding that plaintiff
failed to identify trade secrets with specificity because it failed
to differentiate trade secret portions of software from portions
already known to the trade).

updated versions of information already in the public domain. Instead, the court holds that a reasonable jury could only find that the five AMC-OILs are *not* trade secrets. Therefore, Rolls-Royce is not entitled to summary judgment establishing its misappropriation of trade secrets claim as to the five AMC-OILs; defendants are entitled to summary judgment dismissing Rolls-Royce's claim to the extent based on the five AMC-OILs.

VIII

The court has denied Rolls-Royce's motion for partial summary judgment establishing its misappropriation of trade secrets claim as to the remaining 16 part drawings because the claim may be time-barred. *See supra* at § V(D). The court has also concluded that defendants have not shown that this component of Rolls-Royce's claim is time-barred. The court now considers whether defendants are entitled to summary judgment on another basis: that Rolls-Royce cannot recover on the merits.

A

Defendants maintain that Rolls-Royce cannot recover on this claim because the remaining 16 part drawings are not trade secrets. In deciding whether the drawings are trade secrets, the court must consider whether they are (1) information, (2) with independent economic value, (3) that is not generally known or readily ascertainable, and (4) that is the subject of reasonable efforts to maintain its secrecy.

The parties do not dispute that the part drawings are information. Similarly, they do not dispute whether the information has independent economic value.[36] Defendants instead assert that the drawings are not trade secrets either because they are already in the public domain (making them readily ascertainable), or they have not been the subject of reasonable measures to protect their secrecy.

B

The determination whether security measures are reasonable is fact-sensitive. *See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 246 (Ind. App. 2001). Absolute secrecy is not required. *Webster Eng'g & Mfg. Co. v. Francis,* 1993 WL 406025, at *4 (D. Kans. 1993). Restricting access, requiring confidentiality agreements, and posting proprietary warnings have been deemed sufficiently reasonable measures to protect secrets. *See PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *16 (N.D. Ill. 1996) (applying the UTSA) (holding that restrictions on access, "private and confidential" markings, and confidentiality agreements were

_____

[36]Value to potential competitors is enough to give information independent economic value. *See Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc.*, 289 Fed. Appx. 916, 922 (6th Cir. 2008) (applying UTSA) ("[T]he secret information must afford the owner a competitive advantage by having value to the owner and potential competitors."). Rolls-Royce states that the part drawings can be used to obtain PMA from the FAA and then used to manufacture Model 250 parts. This fact alone indicates that the drawings have value because they afford competitors the opportunity to manufacture the parts for sale. A reasonable jury could therefore find that the part drawings have economic value.

more than the reasonable efforts required by the statute).

Rolls-Royce has presented evidence that the drawings have never been publicly available. Rolls-Royce distributed the part drawings to distributors, but it asserts that, when it did, it always contractually required them not to disclose the contents.[37] Defendants have adduced evidence that these contractual provisions were often ignored. For example, defendants cite a declaration from a former Rolls-Royce employee stating that distributors were encouraged to maintain libraries of service information, including some part drawings, and make the information available on request to the public. *See* Ds. App. 70 (referring generally to "aperture cards containing part drawings"). But defendants' evidence consists of general statements about Rolls-Royce's practices; it does not clearly show that the 16 remaining part drawings were not consistently protected. Additionally, defendants present evidence generally that Rolls-Royce data were distributed to libraries, but they fail to introduce proof that these specific part drawings were ever released. Rolls-Royce asserts that while *tool* drawings were released more broadly, the part drawings in question were not. The part drawings themselves, as reproduced in both parties'

---

[37]Rolls-Royce did not make its information generally known by providing it to parties with whom it had a confidential business relationship. *See Diamond Power Int'l, Inc. v. Davidson*, 540 F.Supp.2d 1322, 1333 (N.D. Ga. 2007) ("The disclosure of a trade secret to persons with whom the plaintiff has a confidential business relationship, however, generally does not destroy trade secret protection.").

appendixes, contain proprietary rights markings, permitting a reasonable jury to find that Rolls-Royce sought to control access to the documents.

Because Rolls-Royce has introduced some evidence of protection, and defendants have not presented evidence that is specific to the part drawings in question, it is unclear whether these documents were in the public domain or were improperly protected. Therefore, there is a genuine issue of material fact about whether the part drawings were properly protected. The court denies defendants' summary judgment motion as to the 16 part drawings at issue.

C

In summary, the court grants summary judgment dismissing Rolls-Royce's misappropriation of trade secrets claim as to all documents at issue except the 16 part drawings. The court denies summary judgment in favor of either side as to those 16 drawings because genuine issues of material fact remain regarding whether the claim is time-barred and whether the part drawings qualify as trade secrets.

IX

Rolls-Royce moves for summary judgment as to defendants' counterclaim seeking a declaratory judgment that Rolls-Royce has no proprietary interest in the Model 250 drawings and technical information. Neither party sufficiently addresses Rolls-Royce's

motion on this counterclaim.[38] The court has already held that there is a fact issue regarding whether the 16 remaining part drawings are trade secrets. As for other Model 250 information, defendants have presented some evidence, mentioned above, that information relating to the Model 250 has not always been properly protected. The court therefore denies Rolls-Royce's summary judgment to the extent it seeks dismissal of defendants' declaratory judgment counterclaim.

X

Rolls-Royce moves for summary judgment dismissing defendants' counterclaim for unlawful tying.

A

An illegal tying arrangement exists if "the seller [exploits] control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 406 (5th Cir. 2008) (quoting *Ill. Tool Works, Inc. v.*

---

[38]Rolls-Royce's only summary judgment argument relating to this counterclaim consists of the following, contained in a footnote: "To the extent the Court grants summary judgment in favor of Rolls-Royce on its trade secret misappropriation claim, this resolves, as a matter of law, Defendants' declaratory judgment action (Count VIII of their counterclaim) as it relates to the Rolls-Royce Trade Secret Part Drawings and AMC-OILs addressed herein." P. Mot. Sum. J. Br. 21-22 n.8. Defendants' counterclaim, however, appears to pertain to all Model 250 technical information, not simply to the information at issue in Rolls Royce's misappropriation claim. Defendants do not mention this counterclaim.

*Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006)).  The desired product is the "tying product"; the product the buyer is forced to purchase is the "tied product."  *Logic Process Corp. v. Bell & Howell Publ'ns Sys. Co.*, 162 F.Supp.2d 533, 539-40 (N.D. Tex. 2001) (Lindsay, J.).  "In proving that a tying arrangement in fact existed, it is not enough to show that the defendant made strong efforts to persuade, encourage, or cajole the plaintiff into buying the product."  *Dr Pepper Bottling Co. of Tex. v. Del Monte Corp.*, 1990 WL 291495, at *7 (N.D. Tex. Jan. 30, 1990) (Fitzwater, J.) (citing *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981)).  The defendant must go beyond persuasion and force the plaintiff to buy the tied product to obtain the tying product.  *Id.*  The force cannot simply be contractual: for example, if a franchisor contractually requires its franchisees to purchase certain products.  "'[E]conomic power derived from contractual agreements such as franchises or [an] agents' contract . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.'"  *Schlotzsky's*, 520 F.3d at 408 (quoting *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) (alterations in original)).

B

Defendants make clear that the allegedly tied products are Rolls-Royce aircraft engine replacement parts.  But their counterclaim is considerably less clear regarding what is the tying

product. Defendants' allegations appear to present two possibilities: the aircraft engine itself or engine repair services. In their response to Rolls-Royce's motion for partial summary judgment, they point to several pieces of evidence to prove tying.

First, defendants rely on a proposed amendment to a distributor agreement, suggested in an April 1994 internal memorandum, that would have forbidden Rolls-Royce distributors from using PMA replacement parts (replacement parts not produced by Rolls-Royce). But defendants do not argue that such an amendment was ever adopted,[39] and the court therefore concludes that this evidence is irrelevant.

Second, defendants allege that Rolls-Royce contractually forbids its AMCs from keeping PMA parts in inventory. Although defendants argue that Rolls-Royce is thereby "tying its replacement parts to its engine," Ds. Resp. Br. to P. Mot. Partial Sum. J. 47, it appears that this allegation would actually indicate either that Rolls-Royce is tying Rolls-Royce replacement parts to repair services at an AMC or tying AMC status to the purchase of Rolls-Royce replacement parts. Even assuming the truth of this allegation, an unlawful tying arrangement cannot be based on a contractual relationship of this type. For example, a franchisor

---

[39]Even defendants' expert's report states that this proposal was not adopted (for fear of antitrust litigation). *See* Ds. App. 1037.

can place limitations on purchases made by its franchisees because the power is based in contract, not market power. *See Schlotzsky's*, 520 F.3d at 408 ("[Plaintiff] had the contractual right to require franchisees to purchase from a specific distributor. That contract power is distinguishable from market power . . . that more readily may be classified as leading to an illegal tying arrangement."). Similarly, agreements made in contracts between Rolls-Royce and its AMCs cannot alone be the basis of tying claims because they stem from a contractual relationship akin to franchising, not the coercion of market power.

Defendants point to no additional evidence of a tying arrangement. In their amended answer and counterclaim, they refer to Rolls-Royce's supplying consumers with "improper, misleading or false service information" and Rolls-Royce's dishonoring an engine's warranty if an owner uses PMA replacement parts.[40] Am. Ans. 45. But defendants have neither presented evidence of these claims nor have they referred to them in their briefing.

The court therefore grants Rolls-Royce's motion for summary judgment dismissing defendants' tying counterclaim because

---

[40]Moreover, a reasonable jury could not find that such evidence constitutes the kind of "actual coercion" that is necessary. *See Bob Maxfield*, 637 F.2d at 1037 ("We have held that actual coercion is an indispensable element of a tie-in charge. A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce his retailer to buy its full line of products. An antitrust violation occurs only if it goes beyond persuasion and coerces or forces its customer to buy the tied product in order to obtain the tying product.").

defendants have failed to present evidence that would enable a reasonable jury to find an illegal tying arrangement.

XI

Before reaching defendants' remaining antitrust claims, the court must address Rolls-Royce's motion to exclude the opinions of defendants' antitrust expert, Dr. Pflaum.

A

Dr. Pflaum is an economist with an MBA and a Ph.D. in Finance and Operations Management who has extensive experience testifying as an expert witness in antitrust litigation. Rolls-Royce does not contest either Dr. Pflaum's expert qualifications as to antitrust economics[41] or the relevance of his opinions. Instead, Rolls-Royce challenges the reliability of his methods and, in some instances, argues that Dr. Pflaum's conclusions are questions for the jury to decide.

B

First, Rolls-Royce asserts that Dr. Pflaum's report reaches conclusions beyond his expertise by opining on FAA regulations or the law. The few "conclusions" that Rolls-Royce highlights are actually statements of what Dr. Pflaum understands the facts to be,

---

[41]Rolls-Royce does contest defendants' description of Dr. Pflaum as an "economist in the PMA industry." Ds. Resp. Br. to P. Mot. Exclude Pflaum 3. The court agrees that this description inaccurately reflects Dr. Pflaum's expertise, because nothing in his report or any other evidence indicates that Dr. Pflaum was familiar with the aviation industry before he began working on this lawsuit.

or assumptions that Dr. Pflaum has relied on in conducting his analysis. Dr. Pflaum does not purport to testify to these facts based on personal knowledge; defendants would be required to present other evidence of those facts to lay the predicate for his opinion testimony. For example, in assessing whether Rolls-Royce's practices are anticompetitive, Dr. Pflaum assumes that Rolls-Royce's trade secret claims lack merit. He makes clear that he "will not be offering an opinion on the legitimacy of [Rolls-Royce's] claims regarding its [intellectual property] rights." Ds. Resp. to P. Mot. to Exclude Pflaum App. 5. Similarly, Dr. Pflaum does not consider himself to be an expert on FAA regulations. *See* P. Mot. Exclude Pflaum App. 203. Dr. Pflaum is not being offered to opine either on the law or on FAA regulations. The court therefore declines to exclude Dr. Pflaum's testimony on these grounds.

Second, Rolls-Royce objects on the ground that Dr. Pflaum is improperly repeating the contents of documents that the jury should itself interpret. Dr. Pflaum relies on evidence derived from various documents to opine that Rolls-Royce engaged in anticompetitive behavior. He recites these facts for the purpose of identifying the evidence on which he has relied in formulating his opinions.[42] Rolls-Royce specifically objects to Dr. Pflaum's

---

[42]According to Dr. Pflaum, "[i]n an antitrust case, it is the job of the economist to put facts, including those found in documents, into a framework for the jury. This involves explaining

conclusion that the market share of independent AMCs can be attributed to Rolls-Royce. The court will assume *arguendo* that this evidence is admissible because, as it explains below, a reasonable jury could not find from this evidence that Rolls-Royce has monopoly power in the replacement parts industry.[43]

Third, Rolls-Royce objects to Dr. Pflaum's one product-one price economic theory. Dr. Pflaum opines that variations in price for identical products only arise from market failures such as anticompetitive behavior. In other words, Dr. Pflaum opines that if two products are identical, they should have identical prices in a well-functioning competitive market. Rolls-Royce argues that this theory ignores differences between seemingly identical replacement parts or engine repair services, such as differences in warranties. Rolls-Royce also points to the premium prices often commanded by a brand name good or service as explaining price variation. It offers its own expert's opinion that Dr. Pflaum's theory is only applicable to truly identical commodities and that engine parts and repair services are not commodities that can be described by this theory. Rolls-Royce does not, however, contest the existence of the one product-one price theory in the field of

_____

why conduct, in the opinion of the economist, was anticompetitive." Ds. Resp. to P. Mot. to Exclude Pflaum App. 7.

[43]Rolls-Royce also objects to Dr. Pflaum's methodology in calculating antitrust damages. For the same reason, the court need not address this objection.

economics.

The court concludes that the parties' disparate perspectives on one product-one price theory are the proper subject of cross-examination and contrary testimony, not a basis to exclude Dr. Pflaum's opinion. *See, e.g., Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 485 (5th Cir. 2008) (holding, *inter alia*, that criticism of expert testimony "affect[s] the weight to be assigned to that opinion . . . and should be left for the jury's consideration." (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (brackets in original; emphasis omitted)); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted)). The court declines to exclude Dr. Pflaum's opinions as to his one product-one price theory.

## XII

Rolls-Royce moves for summary judgment dismissing defendants' other antitrust counterclaims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

### A

To establish a violation of § 1, defendants must prove that (1) Rolls-Royce and others engaged in a conspiracy, (2) the

conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market. *See, e.g., Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).

To prove a claim under § 2, defendants must show that Rolls-Royce (1) possessed monopoly power in a given market and (2) that it acquired or maintained that power wilfully (as opposed to having acquired and maintained power through business acumen, the sale of a superior product, or historical accident). *See, e.g., Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). "Monopoly power is defined as 'the power to control prices or exclude competition.' More precisely, it is 'the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable.'" *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991)).

"While there is no magical percentage of market power that will qualify as monopoly power under § 2, the Supreme Court has concluded that an 87% share of the market and over two-thirds of the market both constitute monopoly power under § 2." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 822 (6th Cir. 1997)

(citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571, (1966) (87% of market constitutes a monopoly); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (over two-thirds of market constitutes a monopoly)). But "market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share." *Am. Council of Cert. Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir. 1999).

B

Defendants assert on several grounds that Rolls-Royce violated the Sherman Act.

Defendants allege that this lawsuit violates the Act because it is an attempt to "'recapture' publicly available technical data . . . and preclude [defendants] from possessing and using that data to service the Model 250 engine" constituting an antitrust violation under the statute. Ds. Resp. Br. to P. Mot. Partial Sum. J. 43. Rolls-Royce maintains that its litigation efforts cannot form the basis of an antitrust violation.

Under the *Noerr-Pennington* doctrine, a party may petition the government for redress of its grievances without giving rise to antitrust liability. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-39 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965). The Court

later extended petitioning immunity to litigation, including threats of litigation. *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983). "Sham" litigation, however, does not qualify for the *Noerr-Pennington* exception; i.e., if Rolls-Royce's litigation is a sham, its conduct may form the basis of an antitrust claim. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Inds., Inc.*, 508 U.S. 49, 56 (1993). To constitute a "sham," the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. *Id.* at 60. "[E]vidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Id.* at 59. If an objective litigant could have probable cause to conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr-Pennington*. *Id*. If the challenged litigation is found to be objectively baseless, the lawsuit must further conceal an attempt to interfere directly with the business relationships of a competitor. *Id*.

> The "sham" exception to [*Noerr-Pennington*] encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. A "sham" situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so *through improper means*.

*Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F.Supp.2d 538, 552 n.7 (N.D. Tex. 2007) (citations and some quotation marks omitted; alterations in original).

A reasonable jury could not find that Rolls-Royce's claims are objectively baseless. Although the court holds today that Rolls-Royce is not entitled to recover on components of its claims and that other components are time-barred, the court is not dismissing Rolls-Royce's lawsuit in its entirety. Moreover, a reasonable jury could not find that the components of the claims that the court is dismissing today were objectively baseless. For example, after Rolls-Royce discovered weaknesses in its claims regarding some documents, it pared down the grounds for the claims. Accordingly, a reasonable jury could not find that Rolls-Royce violated the Sherman Act by pursuing this litigation.

C

Defendants also allege that Rolls-Royce violated § 2 of the Sherman Act by illegally monopolizing the replacement parts market for Model 250 engines. In its summary judgment motion, Rolls-Royce points the court to the absence of evidence of an illegal monopoly of the replacement parts market.

As explained *supra* at § II(A), because defendants will have the burden of proof on this counterclaim at trial and Rolls-Royce has pointed the court to the absence of evidence to support the counterclaim, defendants must present sufficient proof to enable a

reasonable jury to find in their favor on every essential element of their § 2 counterclaim. Defendants' failure to present such evidence as to any essential element renders all other facts immaterial. In particular, defendants must present evidence that would enable a reasonable jury to find in their favor on the first element: that Rolls-Royce possessed monopoly power in the replacement parts market.

In response to Rolls-Royce's motion, defendants focus almost exclusively on the repair *services* market, largely failing to make arguments specific to the replacement *parts* market. The only evidence that is specific to the replacement *parts* market is the report of Dr. Pflaum, in which he opines that Rolls-Royce possesses an 84% market share in the replacement parts market, and a Rolls-Royce marketing plan that defendants maintain supports that opinion.

The court holds that a reasonable jury could not find from this evidence that Rolls-Royce has monopoly power in the replacement parts industry. Dr. Pflaum's 84% market share opinion is based entirely on his estimate of Rolls-Royce AMCs' share of the Model 250 repair services market. He reasons that Rolls-Royce's share of the replacement parts market must be as large as 84% because Rolls-Royce requires its AMCs to use Rolls-Royce parts when making repairs. *See* Ds. App. 1030, ¶ 28. This reasoning assumes that all AMC repairs use only Rolls-Royce replacement parts, but

defendants' own evidence contradicts that assumption. As part of their tying claim, defendants point to a proposed amendment to a distributor agreement that would have required distributors to use only Rolls-Royce parts, but defendants also note that the amendment was merely proposed, not adopted. Dr. Pflaum essentially admitted this at his [March 12, 2009] deposition. He testified that AMCs are not prohibited from using PMA parts, that a customer could request a part of his own choosing, and that AMCs use PMA parts when a Rolls-Royce part is not available within two days. Therefore, because a reasonable jury could not find that Rolls-Royce requires its AMCs to use only Rolls-Royce parts, it could not find, based on the opinion of Dr. Pflaum, that Rolls-Royce has an 84% market share. Defendants also cite a 2002 Rolls-Royce marketing plan, but it contains nothing that appears to confirm Dr. Pflaum's estimate of Rolls-Royce's share of the replacement parts market.

Defendants have presented no further evidence that Rolls-Royce maintains a monopoly in the repair parts market. The court is not required to comb the record in search of a genuine issue of material fact. "Rule 56 does not impose a duty on the district court to sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)). Because

defendants have failed to produce evidence that would permit a reasonable jury to find that Rolls-Royce has a monopoly of the replacement parts market, the court grants summary judgment dismissing this component of defendants' counterclaim under § 2 of the Sherman Act.

D

Defendants also allege that Rolls-Royce violated the Sherman Act by monopolizing the worldwide market for Model 250 repair services. They present evidence that Rolls-Royce controls 85% of the repair market.[44]

Rolls-Royce argues that defendants' market share calculation is inaccurate because it attributes to Rolls-Royce the combined market shares of its authorized repair centers, which operate independently and service non-Rolls-Royce engines as well. Rolls-Royce does not repair Model 250 engines. It asserts that, without this improper attribution, defendants cannot demonstrate that it possesses monopoly power over the Model 250 repair services market. Essentially, Rolls-Royce argues that its control of the AMCs does not enable it to affect the price of repair services, so it cannot have monopoly power.

Defendants counter that Rolls-Royce "controls . . . every

---

[44]As noted above, Rolls-Royce objects to the admissibility and merits of this opinion. Given the court's analysis of the merits of defendants' counterclaim, the court will assume that the opinion is admissible.

aspect of [its network of service providers] through its AMC agreements, Policy Manuals, setting of discounts for purchase of parts through Aviall, periodic audits, fines, control of repair activities, embodi[]ment reporting requirements and fees." Ds. Resp. Br. to P. Mot. Partial Sum. J. 49.

Defendants have failed to adduce evidence that would enable a reasonable jury to find that Rolls-Royce has monopoly power in the market for Model 250 repair services. Other than conclusory averments, defendants have not produced evidence that the AMC agreements allow Rolls-Royce to directly or indirectly affect the price for repair services. AMCs are independently-owned repair shops[45] that pay a participation fee in return for technical information, instruction from Rolls-Royce (some of which is proprietary), and discounts on Rolls-Royce parts. But a reasonable jury could only find that most AMCs are not solely dedicated to servicing Model 250 or Rolls-Royce engines, that AMCs have the power to set their own prices, and that they compete *against each other* for work. Monopoly power exists only if an entity can control prices. The court therefore holds that a reasonable jury could not find that Rolls-Royce has monopoly power over Model 250 repair services and that defendants are entitled to summary judgment dismissing this basis for defendants' § 2 claim.

---

[45]Rolls-Royce owns one AMC and a share of another. But defendants offer no evidence that these entities control a significant portion of the repair market.

E

Defendants also allege that Rolls-Royce violated § 2 of the Sherman Act through attempted monopolization. To establish this counterclaim, defendants must prove (1) that Rolls-Royce engaged in predatory or exclusionary conduct, (2) that Rolls-Royce possessed the specific intent to monopolize, and (3) that there was a dangerous probability that Rolls-Royce would succeed in its attempt. *See, e.g., Bell Atl. Corp. v. AT&T Corp.* 339 F.3d 294, 302 (5th Cir. 2003).

Defendants do not clearly plead this cause of action, or facts supporting this counterclaim. They identify count IV of their counterclaim as a claim for "Abuse of Monopoly Power" under §§ 1 and 2 of the Sherman Act. But they neither mention the theory of attempted monopolization nor do they plead facts that would support such a theory. Defendants only mention this claim in their response to Rolls-Royce's partial summary judgment motion, stating that "[l]iability under Sherman 2 can also arise from . . . attempted monopolization." Ds. Resp. Br. to P. Mot. Partial Sum. J. 48. Even then, defendants fail to provide evidence for an attempted monopolization claim and instead simply recite the elements of the claim.

The court declines to consider defendants' attempted monopolization claim because they did not plead it and instead raise it improperly for the first time in their summary judgment

response.  *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *1 n.1 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) (citing *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("'A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.'").  A party is not entitled to defeat summary judgment based on claims that have not been asserted as of the time the opposing party has filed a summary judgment motion.  *See, e.g., El Sereno, LLC v. City of Garland*, 2010 WL 1741334, at *1 n.5 (N.D. Tex. Apr. 29, 2010) (Fitzwater, C.J.) (citing *Days Inn Worldwide, Inc. v. Sonia Invs.*, 2006 WL 3103912, at *20 (N.D. Tex. Nov. 2, 2006) (Fitzwater, J.)).

XIII

Defendants allege that Rolls-Royce violated the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code Ann. §§ 15.05 (Vernon 2002) ("TFEAA").  In its summary judgment motion, Rolls-Royce points to the absence of evidence that it engaged in any conduct prohibited by the TFEAA.  Because Rolls-Royce has pointed to the absence of evidence of a TFEAA violation, defendants must go beyond their pleadings and designate specific facts showing that there is a genuine issue for trial.

Defendants have failed to address this ground of Rolls-Royce's motion.  Their failure to respond does not, of course, permit the court to enter a "default" summary judgment.  The court is

permitted, however, to accept defendants' evidence as undisputed. *See Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.). Moreover, defendants' failure to respond means that they have not designated specific facts showing that there is a genuine issue for trial on any of their claims. "A summary judgment nonmovant who does not respond to the motion is relegated to her unsworn pleadings, which do not constitute summary judgment evidence." *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).

Because Rolls-Royce has pointed to the absence of evidence to support essential elements of defendants' counterclaim, and defendants have not adduced evidence that raises a genuine issue of material fact on the counterclaim, Rolls-Royce is entitled to summary judgment dismissing this counterclaim.

XIV

The court now turns to consider the remaining pending motions.

Defendants move the court for leave to designate responsible third parties pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 33.004 (Vernon 2008). Rolls-Royce maintains that Texas law does not apply.

"Under [*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)], federal courts apply state substantive law to any issue or claim which has its source in state law. Yet, federal law, rather than

state law, invariably governs procedural matters in federal courts." *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 409 (5th Cir. 2006) (citations and internal quotation marks omitted) (quoting 19 Charles Alan Wright, et al., *Federal Practice & Procedure* § 4520 (2d ed. 2002)). The same rules apply when federal courts exercise supplemental jurisdiction over state-law claims, as is the case here.[46] Therefore, if § 33.004 is procedural, federal procedure, rather than § 33.004, controls.[47] If § 33.004 is

───────────────

[46]Although the court has federal question jurisdiction, it exercises supplemental jurisdiction over Rolls-Royce's state-law trade secret misappropriation claim. Therefore, the court applies substantive state law and federal procedure as it would if exercising diversity jurisdiction. *See* 18B Charles Alan Wright, et al., *Federal Practice & Procedure*, § 4473 (2d. ed. 2002) ("Consistency presumably would require the same reliance on state law when a state-law claim is presented to a federal court exercising supplemental jurisdiction [as when exercising diversity jurisdiction]."); *see also Sommers Drug Stores Co. Employee Profit Sharing Trust*, 883 F.2d at 353 ("A federal court exercising pendent jurisdiction over state law claims, must apply the substantive law of the state in which it sits.").

[47]The Fifth Circuit has not determined whether § 33.004 is substantive or procedural. Some district courts have held that § 33.004 is substantive. *See, e.g., Harris Constr. Co. v. GGP-Bridgeland, LP*, 2009 WL 2486030, at *1 n.1 (S.D. Tex. Aug. 10, 2009) (holding, in diversity case, that "Texas proportionate responsibility statutes reflect a substantive state policy" and are not procedural). This court has adopted a somewhat tentative approach to the application of § 33.004. *See, e.g., Nels Cary, Inc. v. Day*, 2008 WL 631242, at *1 (N.D. Tex. Feb. 29, 2008) (Fitzwater, C.J.) (noting that it has applied § 33.004 in diversity cases and will continue to do so until persuaded that the statute does not apply, but suggesting no view on such matters as whether the statute's references to "the pleading requirement of the Texas Rules of Civil Procedure," and to "the pleading requirements of the Texas Rules of Civil Procedure," apply in a diversity case, or that the provisions of § 33.004 that impose time limitations on seeking leave or objecting to motions for leave would apply in a diversity

substantive, the court must apply the law of the state in which it sits, meaning that it must follow Texas choice of law rules to decide which state's law applies. For tort law, Texas courts look to the Restatement (Second) of Conflicts § 145, which provides: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties[.]" Restatement (Second) of Conflict of Laws § 145 (1971). *See also Dtex, LLC v. BBVA Bancomer, S.A.*, 512 F.Supp.2d 1012, 1027-28 (S.D. Tex. 2007); *Small v. Small*, 216 S.W.3d 872, 880 (Tex. App. 2007, pet. denied).

Defendants essentially concede that Texas does not have the most significant relationship to the occurrence and the parties. They agree that this dispute bears a more significant relationship to California or Indiana than to Texas. Their substantive arguments rely on the UTSA, which has not been adopted in Texas. Further, even after Rolls-Royce raised the choice of law issue in its response brief, defendants do not argue that Texas is the state with the most significant relationship to the dispute. Accordingly, this court will not apply Texas substantive law.

Therefore, if § 33.004 is procedural, federal procedure

---

case to circumvent a scheduling order that imposes other deadlines). But once again, today's case does not require that the court engage in an extensive analysis of whether § 33.004 is substantive or procedural because Texas law does not control.

controls.  If it is substantive, the law of a state other than
Texas governs.  Because defendants have brought their motion under
§ 33.004, a provision of Texas law, the court denies the motion.[48]

                                    XV

     The court next considers defendants' outstanding evidentiary
motions.

     Defendants object to part of Rolls-Royce's summary judgment
evidence.  Specifically, they maintain that Thomas Leonard
("Leonard"), a Rolls-Royce employee, lacks personal knowledge to
support several statements contained in his declaration.
Defendants contend that, because Leonard only began working at
Rolls-Royce in 1998, he lacks personal knowledge of prior events.
They also posit that Leonard's reference to business records is an
insufficient foundation for his subsequent statements.  Leonard
testifies that part drawings contained in a list in an appendix to
his declaration are the proprietary part drawings at issue in this
litigation.  He also testifies as to Rolls-Royce's contracts with
its AMCs, the security measures implemented regarding Rolls-Royce
proprietary information, and the addition of new information in the
updated OILs.

_____

     [48]The court notes that the Supreme Court's recent decision in
*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
__ U.S. __, 130 S. Ct. 1431 (2010) (plurality opinion), addresses
the proper framework for resolving conflicts between state and
federal procedure in federal court.  But because the court need not
determine whether § 33.004 is substantive or procedural law, it
need not analyze this motion under the *Shady Grove* framework.

"[A]n affidavit can adequately support a motion for summary judgment when the affiant's personal knowledge is based on a review of [his] employer's business records and the affiant's position with the employer renders [him] competent to testify on the particular issue which the affidavit concerns." *Carson v. Perry*, 1996 WL 400122, at *1 (5th Cir. June 6, 1996) (per curiam) (unpublished opinion); *see also Monroe Firefighters Ass'n v. City of Monroe*, 2009 WL 916272, at *4 (W.D. La. Mar. 31, 2009) (holding that fire department chief could testify because of his position of responsibility and complete access to department records).

The court rejects defendants' argument that Leonard lacks foundation for these statements. Leonard has worked for Rolls-Royce since 1998 and is currently the manager of Sales and Business Development for Helicopter and Small Gas Turbine engines at Rolls-Royce. He was previously employed for 16 years with a Rolls-Royce Distributor and AMC. His experience, current position with Rolls-Royce, and his review of Rolls-Royce's business records establish sufficient foundation for his statements. *See, e.g., Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 754 (Fed. Cl. 2006) (holding that personal knowledge requirement does not require that affiant be personally involved in all matters at issue, but can include information obtained from review of business records).

Defendants also object to several exhibits referenced by Rolls-Royce in its summary judgment brief. The court has not

relied on any of these exhibits in reaching its decisions. It therefore denies the remainder of defendants' objections to Rolls-Royce's summary judgment evidence as moot.

Defendants ask the court to strike evidence presented by Rolls-Royce in its response to defendants' motion for partial summary judgment. Because the court did not consider any of the evidence to which defendants object, the court denies the motion as moot.

XVI

Defendants seek leave to file an additional appendix to address part drawings for the Rolls-Royce Model 501 engine.[49] Although Rolls-Royce has withdrawn its claims regarding the 501 engine and these part drawings, defendants maintain that their motion is not moot because the 501 engine part drawings prove that another document offered by Rolls-Royce listing all Rolls-Royce documents in the public domain——referred to as the "PAI list"——is incomplete. The court has not relied on the PAI list. Because the evidence that defendants have included in their proposed appendix would not, if considered, affect today's decision, the court denies defendants' motion as moot.

_____

[49]Defendants submitted an appendix in support of their reply brief in support of their motion for partial summary judgment. The court by order advised defendants that it would not consider the appendix because defendants had not sought and obtained leave of court to file it. *See Rolls-Royce Corp. v. Heros, Inc.*, No. 3:07-CV-739-D (N.D. Tex. Feb. 9, 2010) (Fitzwater, C.J.). Defendants then filed a motion for leave.

Rolls-Royce moves to exclude the opinions and testimony of defendants' expert, Molish. Defendants offer Molish in support of their antitrust counterclaims. Because the court has granted summary judgment dismissing these counterclaims without relying on Molish's testimony, it denies Rolls-Royce's motion as moot.

\*     \*     \*

Accordingly, for the reasons explained, the court resolves the motions addressed in this memorandum opinion and order as follows:

(1) The court grants in part and denies in part Rolls-Royce's December 18, 2009 motion for partial summary judgment. The court dismisses defendants' antitrust counterclaims, but it denies summary judgment as to Rolls-Royce's Lanham Act claims and defendants' declaratory judgment counterclaim.

(2) The court grants in part and denies in part defendants' December 18, 2009 motion for partial summary judgment. The court dismisses Rolls-Royce's misappropriation of trade secrets claim except with respect to the 16 part drawings still at issue.

(3) The court denies Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Reno.

(4) The court denies Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Molish.

(5) The court denies Rolls-Royce's December 18, 2009 motion to exclude opinions and testimony of Dr. Pflaum.

(6) The court denies defendants' December 18, 2009 motion for leave to designate responsible third parties.

(7) The court denies defendants' January 22, 2010 motion to strike Rolls-Royce's new, unpleaded claims and summary judgment evidence.

(8) The court denies defendants' February 10, 2010 motion for leave to file appendix.

(7) The court grants Rolls-Royce's February 17, 2010 motion to delete certain part drawings.

**SO ORDERED.**

July 29, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE